Ex parte Harvey Joseph DUFFY, Jr.

No. 64863.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 1, 1980.
Rehearing Denied Nov. 26, 1980.

Maury Maverick, Jr., San Antonio, Mike Tobin, Huntsville, Gerald H. Goldstein and Robert H. Ozer, San Antonio, for appellant.

Bill M. White, Dist. Atty., Charles T. Conaway and Douglas V. McNeel, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

This is a post–conviction application for writ of habeas corpus under the ambit of Article 11.07, V.A.C.C.P.

On September 14, 1976, petitioner was convicted of the offense of capital murder and assessed death after the jury returned with affirmative findings to the three special issues submitted under Article 37.071, V.A.C.C.P. On direct appeal, the Court affirmed the judgment of conviction without dissent, one judge concurring in the result. *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App. 1978). The Supreme Court of the United States, two justices dissenting, denied petitioner's application for writ of certiorari on November 27, 1978. *Duffy v. Texas*, 439

U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978) (Brennan and Marshall, JJ., dissenting consistent with their expressions in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 [1972]).

Having exhausted his avenue of direct appeal, petitioner filed an application for writ of habeas corpus in the 186th District Court of Bexar County on January 8, 1979, alleging that he was denied the effective assistance of counsel during his capital murder trial. Petitioner also advanced the contention that during the course of the trial as well as at critical times prior to trial, he was so heavily sedated by physicians employed by the State that he could not adequately comprehend nor participate intelligently in his own defense. From March 15 through March 19, a hearing was held in the 186th District Court on petitioner's application. On June 4, 1979, the Judge of the habeas court entered findings of fact and conclusions of law on the application recommending that relief in all things be denied. On original presentation to this Court, application for writ of habeas corpus was denied without written order on April 30, 1980. Some two weeks thereafter, however, the Supreme Court of the United States decided *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) in which the Court rejected conventional legal thought dichotomizing retained and appointed criminal defense counsel; *viz*,

"Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, *we see no basis*

for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers." [1]

*Id.* at 446 U.S. 344, 100 S.Ct. at 1716.

Because Part III of the opinion in *Cuyler v. Sullivan*, supra, from which the above excerpt is taken,[2] obliterates any distinction previously made between criminal lawyers in testing for "state action," [3] we granted petitioner's motion for rehearing on May 28, 1980, limited to the question of alleged failure of retained counsel to provide adequate representation. The matter was submitted to the Court En Banc June 18, 1980, on briefs and oral argument. From our examination of the record and aided by the submissions, we are convinced that petitioner was not afforded "effective assistance of counsel," [4] and now vacate the judgment of conviction and sentence of death, and grant the relief sought.

## I.

"On January 14, 1976, the body of Louise Word, an eighty–year–old woman, was found in her house in a rural area of Bexar County. The evidence showed that she had been stabbed ten times with a knife. The front screen door of her house was bent and twisted, indicating a struggle had taken place. Large bloodstains were found in the living room and trails of blood led to the bedroom where the body of the deceased was found. Drawers in the house appeared to have been opened and rifled.

---

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

2. Part III is a unanimous holding by the Supreme Court, speaking through Mr. Justice Powell; Justices Brennan and Marshall, though writing separate concurring opinion, expressly joined in this part.

3. In the margin by way of further explication, Mr. Justice Powell quoted approvingly from *United States ex rel. Hart v. Davenport*, 478 F.2d 203, 211 (3 Cir. 1973):
 "A rule which would apply one fourteenth amendment test to assigned counsel and another to retained counsel would produce the anomaly that the non–indigent, who must

retain an attorney if he can afford one, would be entitled to less protection .... The effect upon the defendant—confinement as a result of an unfair state trial—is the same whether the inadequate attorney was assigned or retained."
Thus, while the claim being addressed was that the federal habeas corpus action had no bottom because "the conduct of retained counsel does not involve state action," both the text and footnote 9 demonstrate that demolishing the prior dichotomy produces a broader effect.

4. Here and generally throughout the phrase is used generically unless in context a more discrete meaning is evidently intended.

"On January 16, 1976, [petitioner] was arrested in Fredricksburg, where he subsequently made a confession to the crime. The evidence reflects that [petitioner] had been in possession of checks belonging to the deceased, and that for two and one–half days [petitioner] had been forging and cashing the checks in three cities. Other evidence found at the scene of the crime connected [petitioner] with the murder."

*Duffy v. State*, supra at 199–200.[5]

On April 14, 1976, petitioner was indicted for the offense of capital murder and on May 5, 1976, Judge Preston H. Dial, Jr., appointed Lonnie Duke, Esq. to represent petitioner in the case. On June 2, 1976, Antonio Cantu, Esq. was also appointed by the trial judge to assist Duke in preparation and trial of the case. During their tenure as counsel, Duke and Cantu prepared and filed a motion for a court appointed psychiatrist as well as a motion for discovery. Neither motion was ever presented to or acted upon by the trial court due to a turn of events beginning soon after these motions were filed.

Between the hours of ten and eleven o'clock on the evening of June 22, 1976, petitioner's father received a telephone call from one who identified himself as Joel Conant, an attorney. Conant said he had talked with his son and was "very much interested" in his case, and would like to discuss it further during office hours the following day. The next morning, Mr. Duffy went to Conant's office where he was formally introduced to the lawyer and again was told that Conant was interested in handling petitioner's case. The pair then went to the Bexar County Jail to visit petitioner; on the way over, Mr. Duffy recalled, Conant gave him "the impression that he was an expert in criminal law and prosecuting [sic] capital murder cases." Following their visit with petitioner an agreement was reached that Conant would defend petitioner in the pending capital murder prosecution. Later in conversation with his son did Mr. Duffy learn that before he was retained Conant had in fact approached petitioner at the Bexar County Jail upon the advice of a jail guard with whom Conant had some character of relationship.

Some three weeks later, Conant announced ready when the case was called for trial on July 12, 1976, however, the trial judge, who later would be the habeas judge, opined that Conant surely needed more time to prepare for trial, and reset the case. Shortly, signals of discontent with Conant appeared in a letter that petitioner dispatched to the trial judge. It relates and requests:

"I am writing you in regard to the postponement of my trial as ordered by you on July 12, 1976.

"It was the stipulation of the court that the reason for the postponement was to allow me to examined [sic] and treated for hepetitus [sic]. As til [sic] this date I have not been examined nor treated for hepetitus [sic]. Not only that Judge Barlow, but the medicine prescribed for me in relation to a nerve condition has been discontinued.

*"I have been in hopes [sic] that my attorney would pay me a visit and could perhaps explain these things and inquire of the officials here of the jail why your explicit orders have been ignored. However, he hasn't been to see me since I was in court July 12, 1976. He is not court–appointed attorney [sic]. I have written him but have not received a reply nor acknowledgement of my letter.*

*"I suppose this is an unusual request, but sir, could you please have my attorney contact me regarding the medical problem?"*

---

5. A fuller exposition of the facts of the offense and its aftermath appears in *Duffy v. State*, supra, at 207–208, and a reading of the complete opinion there will provide a setting for this one. What we propose to do here is, first, to outline the attorney–client relationship and to summarize what followed, editorializing somewhat in the interest of brevity; then each significant failing of counsel and its particular facts will be discussed; finally we will address certain findings of fact and conclusions made by the habeas court.

We are not informed how this matter was resolved. Yet the record does show that before trial began Conant visited his client twice and conferred with his father on two occasions—"and if either lasted over fifteen minutes . . . I would be surprised," said Mr. Duffy. What petitioner said to his attorney is not revealed, but Mr. Duffy told Conant that his son had been under the care of a psychiatrist, naming him, for over a year and that the psychiatrist was available to testify about the mental condition of petitioner and the prior treatment given him. Mr. Duffy also informed Conant of at least two other potential witnesses for his son: one, a former girlfriend knowledgeable about circumstances surrounding his confession; two, a police officer who would testify about his character.

Conant did not move for appointment of a psychiatrist to examine his client or present to the trial court for determination the motion that the appointed attorneys had prepared and filed. Neither did he present a motion for discovery nor call up the one previously filed. Nor did he move to suppress petitioner's confession. His only pretrial motion was for individual voir dire of prospective jurors, a procedure sanctioned by Article 35.17, V.A.C.C.P. and followed as a matter of custom and practice in Bexar County.

Trial began September 7, 1976; the docket sheet reflects that a jury was selected in less than eleven hours. Conant did not voice any objection on the basis of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) to some seven jurors who were challenged for cause even though there was no showing that any of the seven were irrevocably committed to voting against the death penalty regardless of the facts of the case. See also *Adams v. Texas*, —— U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The record does not affirmatively reflect that any of the prospective jurors were required to state under oath, consistent with V.T.C.A. Penal Code,

§ 12.31(b), that the mandatory penalty of life imprisonment or death would not affect their deliberations on any issue of fact.[6]

In presenting its case, the State called some twelve witnesses who laid down a pictorial mosaic of a brutal crime and, with his own confession, the involvement of petitioner in it. Evidence from an inventory search of his motor vehicle was admitted, without having been subjected to pretrial ventilation though a motion to suppress, so objection to its introduction had to be made before the jury. The confession was perhaps the most damaging piece of the picture put together in front of the jury.

The case presented by the State demonstrated guilt of petitioner. Still, Conant did not raise any sort of psychiatric defense, the only one he had. He called but a single witness in defense—the petitioner himself. The habeas court found that his "testimony was incriminatory in many respects." That testimony, particularly the portions excerpted *post*, suggests a perverted, somewhat mocking, attitude produced the "defense" proferred: provocation by an eighty year old woman "striking" him with a cane during the encounter.

After the jury returned a verdict of guilty in less than two hours, and after the State presented its evidence during the punishment stage, Conant again called his client to the stand. Suffice it to say now that petitioner again did himself substantial damage by his performance on the witness stand. Trial counsel also presented to the jury petitioner's priest, and on *direct examination* in response to questioning by Conant he testified that petitioner *was* "the type of individual who would continue upon a course of violence." Cf. Article 37.071(b)(2), V.A.C.C.P. The jury deliberated for some three hours and returned to assess petitioner the death penalty.

On September 20, 1976, Conant filed a two page motion for new trial contending,

---

6. This contention was rejected on petitioner's direct appeal on the grounds that trial counsel voiced no objection to the proceedings or the jurors at any time during the course of the trial thereby permitting a presumption of regularity to rule adversely to petitioner. *Duffy v. State*, supra at 200–201.

*inter alia,* that the trial court erred in admitting evidence of the inventory search of petitioner's truck, as well as in admitting his confession. He had pretermitted a pretrial motion to suppress either the fruits of the search or the confession.

The relationship between petitioner and trial counsel came to an abrupt end, and the trial court again appointed Messrs. Duke and Cantu in response to a request that Conant be removed from the case.[7] Duke and Cantu represented petitioner on direct appeal before this Court and before the Supreme Court denied his application for writ of certiorari. *Duffy v. Texas,* supra.

Though petitioner points to some twelve major failings or instances of incompetence on the part of Conant as trial counsel, we do not reach each one. For reasons more fully developed below, we hold that the abject failure of trial counsel to conduct the requisite factual and legal investigation resulted in abandonment of the only *viable* defense available and, in turn, prompted trial counsel to present a "defense" that relied on acceptance of the testimony of a client who had been diagnosed as being incapable of distinguishing between truth and falsehood and lulled him into presenting a priest who all but answered the second special issue before the jury even retired to deliberate because trial counsel did not take the time carefully to consult with him before calling him to testify. At the threshold, however, we must first deal with two other collateral problems: whether the issue of effective assistance of counsel is properly before us and the standard by which this performance by Conant must be gauged.

## II.

At the outset, we are met with the State's contention that the issue of ineffec-

tiveness of counsel is not properly before this Court inasmuch as the issue was not raised on direct appeal. Arguing that because habeas corpus may not be used as a substitute for direct appeal, see, e. g., *Ex parte Groves,* 571 S.W.2d 888 (Tex.Cr.App. 1978), and that habeas corpus relief generally does not lie where relief could have been obtained by properly preserving the issue on direct appeal, see, e. g., *Ex parte Puckett,* 274 S.W.2d 696 (Tex.Cr.App.1954), the State invites us to apply the "Deliberate Bypass of Appellate Remedies Doctrine" employed by the Fifth Circuit. See, e. g., *Freeman v. Henderson,* 507 F.2d 1229 (5 Cir. 1975). The State even goes so far as to assert that "petitioner's counsel on appeal *deliberately* declined to raise the issue of trial counsel's competence." But an examination of *Freeman v. Henderson,* supra, reveals that the State misinterprets its holding as reflected by the following language contained therein:

> "Where the record *conclusively* and *unequivocally* demonstrates that the *accused* made a *conscious* and *intentional* waiver of his right to a thorough and careful examination of his constitutional claim on direct appeal, the denial of federal habeas corpus relief is proper...
>
> "Where the record of a state trial reveals a *deliberate* bypass *clearly and beyond doubt,* an evidentiary hearing in the federal courts as to whether there was a deliberate bypass is not required."

*Id.* at 1229–1230 [citations omitted].

■ Succinctly stated, this record in no way reflects that petitioner made a conscious and intentional waiver of his right to assert his Fourteenth Amendment claim derived from Sixth Amendment right.[8] That

---

7. The record at the motion for new trial hearing reflects that petitioner strenuously objected to the continued representation by Conant. The basis was Conant's failure to confer with him or otherwise represent him adequately. Petitioner did the best he could to bring the matter to the attention of the trial court–to the point of a near physical altercation with Conant in the presence of the trial judge, so we are told–and we do not know what opportunities he had

thereafter to reiterate his extreme resentment toward Conant and his conduct of the case. Presumably he had been promptly transferred to death row at the Texas Department of Corrections.

8. Beginning at least with the anxious letter petitioner wrote to the trial judge, quoted verbatim *ante,* and the stormy scene preceding a scheduled hearing on motion for new trial, that

the effectiveness issue was not properly raised on direct appeal may be indicative of nothing more than the spectre of ineffective appellate counsel.[9] See, e. g., *Passmore v. Estelle*, 594 F.2d 115 (5 Cir. 1979). The federally created "deliberate bypass" doctrine is not applicable in a State habeas proceeding such as this where a persistently complaining citizen eventually finds attorneys to question the very fairness and integrity of the factfinding process by a founded claim of denial of a right so fundamental as representation by *effective* counsel. *Argersinger v. Hamlin*, 407 U.S. 25, 29–33, 92 S.Ct. 2006, 2008–2010, 32 L.Ed.2d 530 (1972); *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) confirm the right to counsel is a fundamental one.

■ The State's argument must fail for another equally compelling reason. Experience has taught us that in most instances where the claim of ineffective assistance of counsel is raised, the record on direct appeal is simply not in a shape, perhaps because of the very alleged ineffectiveness below, that would adequately reflect the failings of trial counsel. Indeed, in a case such as this, where the alleged derelictions primarily are errors of *omission* de hors the record rather than *commission* revealed in the trial record, collateral attack may be just the vehicle by which a thorough and detailed examination of alleged ineffectiveness may be developed and spread upon a record.

■ Finally, as the Court noted in *Ex parte Groves,* supra, such judicially imposed restrictions "are not absolute," and habeas corpus is the proper forum for one unlawfully restrained of his liberty who is without an adequate remedy at law. In a context as compelling as the case at bar—where the supreme penalty has been assessed—we would be hard pressed to find that our petitioner had any other available remedy in the courts of this State. Accordingly, in the circumstances of this case we reject the State's contention that the issue is not properly before us and turn next to find the appropriate standard to determine if petitioner's claim is well taken in light of *Cuyler v. Sullivan*, supra, and other germane authority.

### III.

The level of trial court performance of an *appointed* criminal defense attorney accepted by the Court, though not with complete assent, is "reasonably effective assistance," *Ex parte Gallegos*, 511 S.W.2d 510 (Tex.Cr. App.1974).[10] However, beginning with *Lawson v. State*, 467 S.W.2d 486 (Tex.Cr. App.1971) and continuing to *Ex parte Ewing*, 570 S.W.2d 941 (Tex.Cr.App.1978), the Court looked for willful misconduct by *retained* counsel without the knowledge of the client that amounts to a breach of the legal duty of an attorney.[11] See, e. g., *Howell v. State*, 563 S.W.2d 933, 937 (Tex. Cr.App.1978); *Harrison v. State*, 552

---

petitioner was insisting on his right to effective assistance of counsel was evident to anyone aware of the events. Nothing before us indicates that petitioner ever wavered in the belief that Conant had ill-served him and his cause.

**9.** See *Duffy v. State*, supra, at 200, note 1, for an account of the oral profession by appellate counsel of ineffective assistance on appeal in failing to file an amended motion for new trial upon leave of the trial court to do so after the notes of the court reporter had been transcribed. That record, though, could not enlighten an appellate attorney as availability of prospective witnesses who were not called or existence of medical records that were not examined. By that time in July of 1977 one is permitted to surmise that petitioner had been transferred to and confined on death row, mak-

ing direct communication with him somewhat difficult; we are not informed whether appellate counsel made the effort.

**10.** Judge Roberts, joined by Judge Odom, would expect "reasonable competence demanded of attorneys in criminal cases," drawing that standard from *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

**11.** Along the way, dissenting in *Ewing v. State*, 549 S.W.2d 392, 396 (Tex.Cr.App.1977), Judge Roberts argued that there should be no distinction in demanding of retained and appointed counsel alike the reasonable competency performance he advocated in *Ex parte Gallegos*, supra.

S.W.2d 151, 152 (Tex.Cr.App.1977);[12] *Hunnicutt v. State*, 531 S.W.2d 618, 626 (Tex.Cr. App.1976).

The rationale originated in post–trial situations where retained counsel bowed out at a critical stage, leaving frustrated the right of his client to protect vital interests in further proceedings. See *Steel v. State*, 453 S.W.2d 468 (Tex.Cr.App.1970) and cases from other jurisdictions cited therein. Furthermore, misconduct of retained counsel, it was then thought, could in no way be attributed to the State for Fourteenth Amendment purposes. *Lawson v. State*, supra, at 488; *Trotter v. State*, 471 S.W.2d 822 (Tex.Cr.App.1971); *Johnson v. Smith*, 447 F.2d 985 (5 Cir. 1971); *Langford v. Alabama*, 422 F.2d 760, 763 (5 Cir. 1969); *Howard v. Beto*, 375 F.2d 441, 442 (5 Cir. 1967). Then came *Ex parte Ewing*, supra.

Acknowledging the argument that effectiveness of retained counsel and appointed counsel should be judged by one standard, the Court examined treatment of the proposition in *Fitzgerald v. Estelle*, 505 F.2d 1334 (5 Cir. 1974, en banc). It found the Due Process Clause of the Fourteenth Amendment standing alone and unaided by incorporation of the Sixth Amendment is violated·when "ineffectiveness [of counsel] has rendered a trial fundamentally unfair, whether he be retained or appointed and whether his action or inaction was known or unknown to state trial officials." When the Sixth Amendment guarantee of assistance of counsel is implicated by State action, however, the applicable standard is the same for both appointed and retained counsel: reasonably effective assistance. And this "state action" measure "covers a greater range of counsel errors than does the fundamental fairness standard." The unanimous *Ewing* court then concluded:

"We agree that to secure relief for ineffective assistance of retained counsel there must also be an adequate showing of state action by failure of a responsible state official connected with the criminal proceeding [such as the trial judge or prosecutor] to take corrective · action when that official had actual or constructive knowledge of retained counsel's failure to deliver reasonably effective assistance."[13]

To recapitulate, after *Ex parte Ewing*, supra, three separate sources of effective assistance of trial counsel had been discovered:

One, the Due Process Clause of the Fourteenth Amendment, unadulterated, requires representation that attains the level of fundamental fairness–from both appointed and retained counsel.

Two, the Sixth Amendment incorporated into the Fourteenth Amendment demands "reasonably effective assistance" from appointed counsel and from retained counsel when requisite State action obtains.[14]

Three, a legal duty an attorney owes to his client is not to be breached by retained counsel nor, for that matter, an appointed counsel.

Now, however, as we have already shown *ante, Cuyler v. Sullivan*, supra, put an end to the "double standard" emanating from the retained–appointed dichotomy. As stated by Mr. Justice Powell, the rationale is *viz*:

"A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. We may assume with confidence that most counsel, whether re-

---

**12.** In dissent Judge Roberts reiterated that both retained and appointed counsel, without distinction, "should be reasonably competent, and neither should render inadequate representation." This time Judge Phillips joined him.

**13.** From this formulation it follows that until denial of reasonably effective assistance of retained counsel is demonstrated the requirement

of State action need not be examined. *Ex parte Ewing*, supra, at 948.

**14.** Fully stated, the test for effective counsel is "counsel reasonably likely to render and rendering reasonably effective assistance," *McKenna v. Ellis*, 280 F.2d 592 (5 Cir. 1961) as quoted approvingly by the Court in *Caraway v. State*, 417 S.W.2d 159, 162 (Tex.Cr.App.1967).

tained or appointed, will protect the rights of an accused. But experience teaches that, in some cases, retained counsel will not provide adequate representation. *The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection.* Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, *we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers."*

*Id.* at 446 U.S. 344, 100 S.Ct. at 1716.

The consequence of *Cuyler*, then, is twofold: the requisite State action is in conducting the criminal trial itself and performance of trial counsel is to be tested by the same standard whether retained or appointed. Thus, the *Ewing* formulation derived from *Fitzgerald v. Estelle* is satisfied without any showing of State action through inaction of a responsible State official connected with the criminal proceeding. All that remains is application of the "reasonably effective assistance" test under the Sixth Amendment incorporated by the Fourteenth–if that is still the test.

*McMann v. Richardson*, supra, has led one member of this Court to an undifferentiated standard of "reasonable competence demanded of attorneys in criminal cases," *Ex parte Gallegos*, supra, at 513–514. Some five federal judicial circuits and ten states have adopted the "reasonable competence" test. See Erickson, "Standards of Competency for Defense Counsel in a Criminal Case, 17 Am.Crim.L.Rev. 233, 239–240 at nn. 57–58 (1979).

Perhaps sensing this "reasonable competency by community standards" test and its

increasing popularity among state and federal appellate courts, able counsel for the petitioner produced and included in our record offers of proof from some eight criminal defense practitioners in Bexar County, comprising an array of outstanding legal talents in that county, indeed in this State, that in their opinion, based upon his revealed conduct in this case, Conant did not render reasonably effective assistance of counsel, did not fulfill his legal duties to a client on trial for the offense of capital murder, and did not meet the minimally acceptable standard of legal assistance in the Bexar County community for such a case.[15]

The State, in brief and at oral argument, proposed its own standard for effectiveness under *Cuyler v. Sullivan*, supra: whether counsel, in the course of his representation of a criminal defendant, engages in willful misconduct or gross negligence that substantially prejudices the accused's cause. The State goes on to define "gross negligence" as a "conscious indifference to the defendant's cause resulting in failure to exercise reasonable diligence in the course of the representation of the defendant." State's Reply Brief at 8. We reject the State's proposal for it is but a throwback to the "breach of duty" notion that has been untenable as an exclusive measure for effectiveness of retained counsel since *Ex parte Ewing*, supra. Moreover, though vague, the touchstone of *Cuyler v. Sullivan*, supra, is "adequate representation," and it immediately occurs that performance by trial counsel may well be "inadequate" through acts of commission or omission less reprehensible than willful misconduct or gross negligence. The result in such cases would be a tacit sanctioning of representation that falls below the Sixth Amendment standard but does not amount to a breach of legal duty. What the State proposes seems more appropriate for assaying a pure

---

**15.** Such defense attorneys included:

(1) Terrence W. McDonald, Professor of Criminal Law, St. Mary's University School of Law in private practice with Nicholas and Barrear, Inc.;

(2) Pat Priest, private practitioner;

(3) John Hrncir, former Bexar County Assistant District Attorney;

(4) Warren Weir, former U.S. Attorney;

(5) Sam Bashara, private practitioner;

(6) Charles Butts, private practitioner and current President of the San Antonio Bar Association;

(7) Fred Semaan, private practitioner; and

(8) Antonio Cantu, former Assistant Criminal District Attorney.

Fourteenth Amendment guarantee of fundamental fairness vouchsafed by its Due Process Clause, and as we view the instant assertions of ineffective assistance of counsel a greater range of counsel errors is invoked.[16]

Ex parte Ewing, supra, is barely two years old and Cuyler v. Sullivan, supra, not even a toddler. Until further experience teaches otherwise we will apply here and continue to use the standard of "reasonably effective assistance of counsel" to test adequacy of representation afforded an accused by retained as well as appointed counsel when the performance is to be judged by the Sixth Amendment right to assistance of counsel made applicable to the states by the Fourteenth Amendment–also by our own "right to be heard" provision of Article I, Section 10, Bill of Rights, Constitution of Texas.[17]

## IV.

### A

A criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance to his client–in or out of the courtroom. Flores y. State, 576 S.W.2d 632, 634 (Tex.Cr.App. 1978); Ex parte Ewing, supra, at 947; see also Herring v. Estelle, 491 F.2d 125, 128 (5 Cir. 1974); Caraway v. Beto, 421 F.2d 636, 637 (5 Cir. 1970); Williams v. Beto, 345 F.2d 698, 705 (5 Cir. 1965). In the seminal decision of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built:

> "It is not enough to assume that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough–going investigation might disclose as to the facts. No attempt was made to investigate."

287 U.S. at 58, 53 S.Ct. at 60, 77 L.Ed. at 165.

**16.** The State also would have it that "[t]he fact that petitioner's counsel solicited [the] case while petitioner was in the Bexar County Jail ... is irrelevant to the issue of effectiveness ..." Yet, the solicitation in this case dramatically underscores the point made by Mr. Justice Powell in Cuyler v. Sullivan, supra: "The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection." Our prohibition against solicitation, State Bar Rules, DR 2–103(A), is premised in part on the thesis that initial misconduct in obtaining the client is a harbinger of "potential harm to the solicited client in the form of overreaching, overcharging, underrepresentation, and misrepresentation," Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 461, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444 (1978). Thus, that Conant "rustled" the client from appointed counsel is not completely irrelevant to the issue of adequacy of his ensuing representation, for certainly it marks the beginning of the "totality of the representation [afforded] the accused," Ex parte Ewing, supra. Solicitation also tends to belie the erstwhile conventional wisdom that simply because he is retained an attorney is not likely to engage in willful misconduct that amounts to a breach of his legal duty to his client and keep it from his client, Lawson v. State, supra, and the initial tainted feature of the attorney–client relationship, in turn, bears on the performance level demanded of what we may call a "self–appointed" counsel. If there are the harms potentially inherent in the solicited relationship that the Ohralik court found, damage that is inflicted by the soliciting attorney, though foreseeable in one sense, was hardly anticipated by the unsuspecting solicited client, and relief should not be precluded by resort to a higher standard of misconduct applied to properly retained counsel. In sum, that the client has been badly served from the outset coupled with some other failing produces a synergism that more acutely flaws the overall performance of the soliciting attorney.

**17.** The "reasonable competence" test proposed by our Brother Roberts lacks appeal at this time for the language of the Supreme Court was spoken in a context of advice of counsel that his client enter a guilty plea. Our concern here is with a much broader course of conduct than counselling a plea; we must judge a full scope of "assistance"–representation, performance, delivery–for effectiveness rather than adequacy of ability or capacity to advise. The standard we retain mandates an examination both of competence, "likely to render," and of assistance, "and rendering," in determining effectiveness of counsel.

An American Bar Association Project echoes these sentiments in proposing that:

Defense counsel has the responsibility to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's information or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty.

ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and Defense Function § 4.1 (Approved Draft 1971).

■ The Court recently reiterated that regardless of complications in a given case, counsel is charged with making an *independent* investigation of the facts of the case, *Flores v. State*, supra, eschewing wholesale reliance in the veracity of his client's version of the facts, *Ex parte Ewing*, supra, at 947. See also *Rummel v. Estelle*, 590 F.2d 103, 104 (5 Cir. 1979), *affd. on other grounds*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (counsel must make an independent examination of the facts, circumstances, pleadings and laws involved).

■ A corollary of this notion is that counsel also has a responsibility to seek out and interview potential witnesses, see, e. g., *Davis v. Alabama*, 596 F.2d 1214, 1217 (5 Cir. 1979); *Harris v. Estelle*, 487 F.2d 1293, 1299 (5 Cir. 1974); *Williams v. Beto*, supra at 702–703, and failure to do so is to be ineffective, if not incompetent, where the

consequence is that the only viable defense available to the accused is not advanced. See *Brooks v. Texas*, 381 F.2d 619, 625 (5 Cir. 1967) and *Smotherman v. Beto*, 276 F.Supp. 579, 590 (N.D.Tex.1967).

■ In light of these authoritatively declared duties and responsibilities, we first reproduce verbatim in the margin what *Conant* says he did by way of preparation for trial [18] and then point out and discuss that which he did not do.

Among the papers on file was the written request made by initial counsel for an independent psychiatric examination of petitioner in which prior commitments under the care of Dr. George Schlagenhauf were mentioned. Mr. Duffy called the prospective witness and his availability to the attention of Conant on more than one occasion before trial. Conant did not contact or interview or examine any records maintained by Dr. Schlagenhauf. Indeed, at the evidentiary hearing, he was "not sure if I recall that name."

Neither did trial counsel bother to contact or confer with two other potentially valuable defense witnesses, petitioner's former fiancee and one W. W. McCord. The first had been interviewed by the investigator for petitioner's court appointed attorneys as well as counsel for the State, yet inexplicably not by Conant. The woman expressed a desire to testify at trial on the issue of whether petitioner's confession was in fact voluntary and advised trial counsel of this desire. When asked at the habeas hearing why he did not call her to testify at trial, trial counsel refused to give any answer at all. McCord was a police officer who had

---

18. At the evidentiary hearing and without elaboration as to their content, except his discussions with prosecutors were primarily in the nature of plea bargaining, when asked to tell what he did by way of preparation Conant answered:

"A: I had several conferences with Mr. Bill Harris. I think one conference with you, and two or three conferences with Mr. Bill White, I believe, is his name, he is a deputy sheriff who was in the investigative division of the sheriff's department here, wherein he opened up his file to me and showed me all the statements of the witnesses that–or possible witnesses that the State would have. I made notations from those, went over the search warrant and with the information I had gained from the states [sic] file I went back and discussed these matters on numerous occasions with Mr. Duffy."

We are constrained to remark that Conant could not have gone over "the search warrant" for the incriminating materials admitted during trial were obtained from an "inventory search" conducted by Bexar County officers in Fredricksburg, Gillespie County.

befriended petitioner and helped him get a job. The officer indicated to petitioner's parents his willingness to testify favorably regarding petitioner's character; they in turn passed this information on to Conant, but he did nothing with it.

With respect to interviewing State's witnesses, neglect infected that responsibility. It was stipulated at the habeas hearing that Conant did not contact or interview any of the twelve witnesses called by the State. While he testified that he had contacted Bill White of the Bexas County Sheriff's Office, the parties stipulated that White would testify otherwise if called. But trial counsel testified and the State contends that the failure to interview its witnesses was harmless because the State "opened its file" to trial counsel. Accordingly, said trial counsel, "I didn't think it was necessary to file a Brady versus Maryland motion." Trial counsel stated that he did not obtain statements from any of the witnesses in this case because he made notations from written statements of the witnesses to which he had access in the sheriff's department.[19] He first announced ready on July 12, 1976, notwithstanding the fact he had not yet conferred with either prosecutor in charge of this case. Though Conant was sure that he had talked with Mr. Harris, co-counsel for the State, *before* July 12, Harris testified otherwise, and his file bears him out. It was impossible for Conant to determine just what quantum of investigation he conducted or what degree of factual information he possessed because as soon as he was discharged by the Duffys he discarded his entire file.

Neither did trial counsel confer with his client in a manner consistent with the gravity of the case he was called upon to defend. It was developed at the habeas hearing that according to the Bexar County Jail "sign-in logs," Conant visited with his client only *twice* from June through September of 1976, the period of his tenure as retained counsel.[20] The State replies with the assertion, citing *Loftis v. Estelle*, 515 F.2d 872 (5 Cir. 1975) and *Daughtery v. Beto*, 388 F.2d 810 (5 Cir. 1967), that "mere brevity of consultation *alone* is insufficient to establish a violation of the Sixth Amendment right to effective counsel." State's Brief at 12. But this record reflects a great deal more than "mere brevity of consultation" and, consequently, the reasoning of *Loftis* and *Daughtery* is inapposite.

Finally, we note that Conant admitted he did not visit the scene of the crime. See Friloux, The Defense View: Pre-trial, at 7, Selected Materials on Trial Practice, National College for Criminal Defense (May, 1979).

In sum, we are unable to find any endeavor worthy of being denominated "an independent investigation of the facts of the case" demanded of competent criminal defense lawyers by this Court in, e. g., *Flores v. State*, and *Ex parte Ewing*, both supra.

### B

■ It is well settled that an attorney has a professional duty to present all available evidence and arguments to support the defense of his client. *Thomas v. State*, 550 S.W.2d 64, 68 (Tex.Cr.App.1977). In the

---

19. Since completeness and accuracy of any prior written statement of a prospective witness depend in part on the skill of the person taking it in directing questions and recording answers, it is not necessarily determinative of all relevant information stored away in the mind of the affiant. Thus, the careful and cautious defense investigator will directly explore every nook and cranny for some unwritten recollection, whether it be helpful or harmful to his client. Moses, Criminal Defense Sourcebook 51.

20. It being inherently prejudicial for a trial court to prohibit overnight consultation between attorney and client, *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the Fifth Circuit has indicated that prejudice need not be shown before an attorney is held ineffective for failing to consult adequately with his client, *Davis v. Alabama*, supra, at 1223. The infrequency of consultation, given the nature of this cause, suggests another shortcoming of trial counsel but we cannot find it amounts to ineffectiveness for the record does not inform us of the content of the consultations that were held.

case at bar, however, this record glaringly reflects that trial counsel failed to advance an insanity defense or in any other way make use of psychiatric evidence available to him. As is so often the case in those situations where a psychiatric defense, or for that matter any viable defense, has not been raised, the dereliction is because the attorney is not familiar with the defense or, if he is, has not adequately investigated the facts of the matter.[21] See, e. g., *Brooks v. Texas*, 381 F.2d 619 (5 Cir. 1967) (insanity); *Smotherman v. Beto*, 276 F.Supp. 579 (N.D. Tex.1967) (insanity); *United States v. Fessel*, 531 F.2d 1275 (5 Cir. 1976) (insanity); *Gomez v. Beto*, 462 F.2d 596 (5 Cir. 1972) (alibi). That this situation is present in the instant case is clear.

■ As noticed earlier, original court appointed attorneys for petitioner filed a motion requesting the appointment of a psychiatrist at State expense in an attempt to develop an insanity defense as well as to test competency to stand trial. But after Conant replaced them, no further mention of or reference to such a motion is found in the record. We are left with the impression that Conant did not discuss with the lawyers he succeeded their formulation of possible defenses, did not obtain his client's file from them nor examine the court file. But it is undisputed that petitioner's father informed Conant that his son had been under the care of Dr. George Schlagenhauf, at the Villa Rosa medical facility in Bexar County for over a year. Yet trial counsel did not contact, interview or attempt to secure Schlagenhauf's attendance at the trial. "[A]n attorney for an accused must use all diligence in securing evidence on the issue of insanity," *Sharp v. State*, 392 S.W.2d 127, 128 (Tex.Cr.App.1965), and it may depend upon how easily evidence may be secured.

At the hearing below, Dr. Schlagenhauf testified that petitioner's mother was a nurse at Methodist Hospital where in making his rounds he came to know her; once

she took the occasion to ask him to see her son. After a number of visits with him, Schlagenhauf came to the opinion that petitioner should be hospitalized, and on December 17, 1971, petitioner voluntarily committed himself to the Villa Rosa psychiatric facility where he stayed for six weeks. On at least two later occasions, the doctor noted, petitioner committed himself, again voluntarily, to the Villa Rosa facility for six week periods during the summer of 1972. After learning petitioner had been arrested for the offense of capital murder, Schlagenhauf felt sure that "somebody would call me" in regards to his past medical history. Shortly thereafter, Cliff Ross, a court appointed investigator, did contact him on or about March 23, 1976, at the instance of Messrs. Duke and Cantu. Denied the opportunity to testify at the trial because Conant did not follow through, the doctor attested at the habeas hearing what he would have testified to at the trial, in pertinent part:

Q [By Mr. Goldstein]: You didn't see any serious assaultive tendencies in [petitioner] at that point?

A: Quite to the contrary. Joe was always a very gentle sort of fellow.

Q: And whether he knew the difference between right and wrong, individuals in this state may have, on occasion, *difficulty or an inability to conform their conduct because of their inability to deal with these situations?*

A: *Uh–huh.*

Q: *Because of the mental state of the problem they are having, the personality disorder—*

A: *That is true.*

Q: *And had Mr. Conant contacted you at the time of the trial in 1976 would you have been able to tell him about Joe's gentle personality and about his inability to tell the difference between right and wrong?*

---

**21.** At one point after he regained the status of appointed counsel (on appeal) Cantu was discussing matters with him and the judge of the trial court remarked that he "was convinced the investigation [by trial counsel] was not proper" and had "a real concern about the investigation" in the case.

A: *Yes.*[22]

██ The Fifth Circuit has repeatedly stressed the "particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." *United States v. Fessel*, 531 F.2d 1275, 1279 (5 Cir. 1976). Indeed, where, as here, trial counsel fails to request the appointment of a psychiatrist at State expense, especially when evidence of guilt is virtually uncontested and the only defense issue for development is the sanity of the accused at the time of the offense, trial counsel has been ineffective. *United States v. Fessel*, supra. The language of Fessel is nicely instructive in explicating why trial counsel there, as here, has not met the mark posed by the Sixth Amendment:

"In the instant case, there could be little doubt as to the appropriateness of an insanity defense and the need for psychiatric assistance to prepare it. The evidence showing Fessel guilty of committing the acts charged was virtually uncontested. *The only issue for the jury to consider therefore was the sanity of the defendant at the time of the offense.* In the absence of live psychiatric testimony favorable to the defendant, the need for a . . . motion [requesting the appointment of a psychiatrist] was manifest. In these circumstances, we hold that the failure of [trial] counsel to utilize [the appointment of a psychiatrist at public expense] denied the accused services necessary to the preparation and presentation of an adequate defense, and thus denied him the minimally effective representation guaranteed by the Sixth Amendment."

*Id.* at 1279.

See also *Brooks v. Texas*, supra; compare *Faz v. State*, 510 S.W.2d 922 (Tex.Cr.App. 1974) and *Coble v. State*, 501 S.W.2d 344 (Tex.Cr.App.1973).

Even without a court appointed psychiatrist, Conant had been told of a history of commitments and knew of the availability of Dr. Schlagenhauf. In similar circumstances the Fifth Circuit has recently found in *Davis v. Alabama*, 596 F.2d 1214, 1218 (1979):

"Not only did the defense attorneys know that insanity was a possible defense; they apparently knew it was Davis's only possible defense. Thus their failure to investigate cannot be excused by saying that it did not seem to be a very strong defense. In deciding not to develop the insanity defense Davis's attorneys effectively decided to put on no defense at all. We cannot say that such an approach amounts to adequate representation." [Emphasis in original]

and, after reviewing more of the record, held, *id.* at 1219:

". . . Still they made no effort to investigate or develop the possible sources of evidence. This is not a borderline case; it is a clear breach of the duty a defense attorney owes to his client."

In *Smotherman v. Beto*, supra, where failure to develop the facts resulted in presentation of nothing more than a *pro forma* insanity defense, it was written:

A lawyer attends a professional school for 3 years; he is instructed in a myriad of legal theories, rules and rationales, all of which are designed to achieve but one end: the development of a searching, inquisitive and analytical mind . . . *The lawyer who does not probe, does not inquire, and who does not seek out all the facts relevant to his client's cause is prepared to do little more than stand still at the time of trial.*

*Id.* at 588.

The State advances the contention, however, that the failure to develop and assert

---

**22.** It is certainly true, as the State points out, that Dr. Schlagenhauf diagnosed petitioner as having a personality disorder of the maladaptive type, was inflicted with an inability to tell the truth, is unlikely to benefit from experienced punishment by society, and probably will continue to behave pretty much the same way; asked if petitioner knew the difference between

right and wrong, the doctor answered, "I think so." Still, that diagnosis and those observations and opinions do not necessarily contradict the conclusions of the doctor, set out in the text above, and they are surely what a competent criminal defense attorney would want to know about his client charged with capital murder.

the defense of insanity was excusable and did not prejudice petitioner because it was a tactical or strategic decision of trial counsel. See, e. g., *Ex parte Parker*, 485 S.W.2d 585 (Tex.Cr.App.1972); *Faz v. State*, supra; *Daughtery v. Beto*, supra. Since the State makes the similar contention with respect to other failings, discussion and disposition of the contention is reserved until we get to the findings and conclusions of the habeas court *post* under Part V.

The State also advances the correlative contention that even if counsel had elected to assert an insanity defense, the evidence adduced by the State would have rendered it unavailing.[23] But this attitude ignores applicable law. The California Court of Appeals spoke to this exact same contention in the Juan Corona case, *People v. Corona*, 145 Cal.Rptr. 894, 911–12, 917–18, 80 Cal. App.3d 724 (1978), and its reasoning is equally applicable to the instant case:

> "The very vice of the procedure followed by trial counsel was his failure to properly investigate and develop facts which could have or would have given rise to the defense in question [insanity]. Also, since the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel. *At any rate, the test of whether a criminal defendant was accorded an adequate legal defense does not depend on the potential success of the defense omitted, but rather on the consideration whether the defense withdrawn from the case was a crucial one ...*
>
> "*In such circumstances we may not save the judgment by speculating whether the defense would have been successful* ; regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is 'fundamentally unfair' and hence constitutes a denial of due process of law. Such a conviction cannot stand."

*People v. Corona*, supra, at 917–918 (citations omitted).[24]

Furthermore, even if speculation reduced the strength of an insanity defense, such matters about which Dr. Schlagenhauf was prepared to testify would have been relevant in mitigation of punishment. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), confirming the now familiar concept that in capital murder cases the jury must be permitted to consider all aspects and the character and record of the accused as well as circumstances of the offense.

Having dealt at this point with errors of omission as they related to his failure adequately to investigate the facts, we turn lastly to a discussion of how this failure contributed to a pair of critical errors of commission: the ill–fated testimony of the petitioner and his priest.

### C

At the trial on the merits, petitioner's entire defense was presented by but one witness: himself. At the habeas hearing below, it was developed that until Friday of the first week of trial, petitioner was receiving a daily dosage of 100 milligrams of mellaril, a potent tranquilizer. Trial counsel had not learned his client was being medicated when he made the decision to put the petitioner on the stand.

---

**23.** Among other testimony the State points to that of petitioner himself:

"Q: There is absolutely nothing wrong with you mentally, is there, Harvey?

A: No, sir; I don't believe so."

But, pertinent in this connection is the poignant observation of Judge Goldberg in *Davis v. Alabama*, supra, at 1220: "An attorney who does seriously interview an arguably insane client may find him to be one of those many insane persons who placidly insist that they are entirely sane ..."

**24.** See *Davis v. Alabama*, supra, at 1222–1223, pointing out that in deciding whether a failure to investigate a possible defense was prejudicial by examining the specific evidence that an investigation would have uncovered, as he have here, a court can "avoid speculating about how a jury would have reacted" to that evidence.

Conant was also singularly unaware of petitioner's manifest inability to distinguish between truth and falsehood.[25]

And so, without any of this information that was readily available to him had he conducted the most cursory factual investigation, Conant implemented his "tactical decision" to place his client on the stand. Totally unaware of Dr. Schlagenhauf's diagnosis that "[petitioner's] manner of relating . . . is so eloquent and superficially genuine that *Joe projects a facade of being a victim of circumstances*," trial counsel led his client through a story premised on the "defense" that he had been provoked by the eighty year old victim when she struck him with a cane.[26] Yet probably the most damaging testimony out of petitioner's own mouth, totally consistent with Dr. Schlagenhauf's analysis that petitioner was "unable to tell the truth without meaning not to tell the truth," was his "denial" of stabbing the victim more than three times:

25. As petitioner's psychiatrist testified at the hearing below:

Q [By Mr. Goldstein]: . . . Did he [petitioner] have difficulty distinguishing between truth and falsehood?
A: *I don't think I could ever depend on Joe to tell me all of the truth. And I don't know that he could really–*it is kind of hard to even give an example. But he would tell me things that were the truth *if I knew what was going on,* but if I didn't know he might tell me or he might tell me something completely different.
Q: All right. And would it be fair to say that *he did not realize the consequences of his answers regarding truths and untruths?*
A: *I think it is fair.*
Q: Is it not true that *you found that he didn't seem to know the difference between telling truth and an untruth?*
A: *Yes.*
 \* \* \* \* \* \*
Q: Doctor, if they had an individual in a life or death situation where that might depend on whether the person was telling the truth or not, would it, in your estimation, *could you have been of benefit to them in terms of advising them of your diagnosis that he [petitioner] was unable to distinguish between truth and falsehood?*
A: *I thought so at the time, and I still do.*
Q: *Did Mr. Conant or anyone else ever come to you and ask you about that and were you able ever to give that opinion to anyone who came to you?*
A: *No.*

"Q: Did you go there to take anything from her?
A: No, sir, I did not. I told that to Detective Bill White... *He kept wanting to know what happened to the other seven wounds.*
Q: What did happen to them?
A: *I don't know.* He kept telling me 'Well, what happened to them? Where are the other seven.' *I told him I didn't do it."*

That the prosecutor was ready, willing, and able to wreak additional havoc on petitioner's "testimony" is more than amply illustrated by the following colloquy:

Q [By Mr. Conaway]: That is what you said. You are savage enough to sit there and tell this jury you stabbed her three times, you are that savage, aren't you?
A: No audible answer.
Q: Are you?

Q: *They never came?*
A: *No.*

26. Q [By Mr. Conant]: After she hit you what did you do?
A: *I was shocked. I didn't know what to think. Why she did it...* It kind of stunned me and then *I guess it was because of the fact I was on drugs, because of the fact of all that was happening,* I just–you know, *she tried to hit me again and then I blocked it and then I stabbed her.*
 \* \* \* \* \* \*
Q: Why did you stab her again?
A: *Because she was still shouting, still screaming, just as if–I don't know, she just started screaming more.* I knew that people had heard it so I dragged her to the back...
Q: Well, after you realized that you had stabbed the woman what did you decide to do then?
A: *I had only stabbed her three times* and I looked at her and there was quite a bit of blood all over and I didn't know whether she was dead or not. It looked like she was dead. If she wasn't dead she was dying. *And I started thinking more about the fact that I was on parole. I knew that I had already messed it up* then so I looked for the checks–I knew that I had to have some money to go somewhere then... I took them and I left.

A: *I am not what you would call it that savage or not.*

Q: Savage enough?

A: I am saying that I stabbed her three times. *I don't know where the other seven went.*

Q: You don't know where the other seven went?

A: *I don't have any idea.* I have stated that from the beginning.

Q: All right. Well, do you suppose that after you stabbed her three times and left someone else came in and stabbed her seven times. *Do you think that anyone is going to believe that, Harvey?*

A: I really don't know. *I hope so because I didn't do it.*

Q: You are just going to sit there and admit stabbing her three times, that's all?

A: *What other defense do I have...*

Testimony given by petitioner at the punishment phase reveals an attitude entirely predictable from the psychological profile drawn by Dr. Schlagenhauf, *viz*:

Q [By Mr. Conant]: How do you feel about killing Mrs. Word?

A: I really don't know how to express how I feel...

Q: How do you feel about it?

A: I am sorry for the offense that I did. I don't know how else I can put it. I know what all the things that happened to me, *I know the condition that I was in. I still don't believe that I did it. I still don't know how that I did it.*

Q: But you know that you did it?

A: *I said that I am not a savage person. I simply don't know how I did it.*

Predictably, the prosecutor capitalized on that attitude, as follows:

Q [By Mr. Conaway]: Why did not you make some effort, since you are so remorseful now—after you have been convicted—why did not you make some effort at the time to do something to help the woman?

A: I simply don't know.

Q: But you sure won't do it again, would you?

A: No, sir; I would not.

Q: You are sorry you murdered her, sorry you stabbed her ten times?

A: *I didn't stab her ten times.*

Q: *You still want to argue about that?*

A: *No audible response.*

Also during the punishment phase, after the State had introduced evidence of five prior felony convictions (none of which involved· crimes against the person), trial counsel called Father Joseph Leroy Manning to persuade the jury that petitioner would not continue upon a course of violence. Cf. Article 37.071(b)(2), V.A.C.C.P. ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"). The record then reflects the following exchange:

Q [By Mr. Conant]: All right, sir. Do you feel that you know the defendant, Mr. Duffy?

A: As well as I know any human being.

Q: All right, sir. That is fair. *In your opinion do you feel that Mr. Duffy is the type of individual who would continue upon a course of violence?*

[State's objection overruled]

Q: *Do you feel that, sir?*

A: *Yes, sir. You said continue on a course of violence.*

Q: Yes, sir.

Though the witness attempted to qualify his affirmative answer by noting that "he was very surprised to learn of the charges against [petitioner] because from my association with him I had detected no indication of violence," it would be hard to imagine a more damaging piece of evidence *elicited on direct examination by the petitioner's own counsel* calculated to convince the jury that this petitioner should be awarded the death penalty. See *Duffy v. State,* supra at 208. Even a minimally cautious attorney would have taken steps to prevent this occurrence.

That this counsel did not is explained by the testimony of Father Manning at the habeas hearing below:

Q [By Mr. Goldstein]: Father, did you have–did you know his–the defense attorney Joel Conant?

A: No.

Q: Had he ever come and interviewed you or asked you any questions with regard to this case.

A: To the best of my recollection we talked for a few minutes. He put me on the stand during the course of the sentencing hearing, and he talked to me a few minutes before that and I don't even recall anything of the conversation.

Q: All right. *Did he ever really ask you what you were going to say when he put you on the stand?*

A: *Not really. No.*

 * * * * * *

Q: And he never bothered you to ask you about . . . what you might say at a punishment stage when that is one of [sic] critical issues they might ask you?

A: *He did not probe at all.*

The cause, then, for this harmful "surprise" [27] by Father Manning is utter failure on the part of trial counsel even to discuss with credentialed and otherwise impressive witness what his response would be to a question going to the heart of one of three issues the jury must decide. "Witness preparation is vital to an effective defense presentation," Moses, Criminal Defense Sourcebook 55, § 3.08 "Advice to Prospective Witnesses."

The State replies that in calling Father Manning to the stand Conant was following the trial strategy of presenting witnesses to convey the idea that petitioner was not a violent person and, in any event, there is no reasonable possibility that the jury verdict would have been different had Father Man-

ning not testified as he did. Of course, that trial counsel would adduce proof touching on the second special issue to be answered by the jury is to be expected of competent counsel. If he did not do so, his very ability to function as a trial lawyer in a capital case would be called into question. That he did so, therefore, is not so much a matter of trial strategy as it is a mandate from the law of the case on trial. The vice flowing from his attempt to carry out that mandate originated, however, in his cavalier preparation of the witness at the punishment stage of trial. When a Catholic priest testifies to a Bexar County jury, members of his faith, we are sure, will be most attentive.

■ Finally, the State's argument that "there is no reasonable possibility" that the death sentence would not have been imposed absent Father Manning's testimony flies in the face of the Supreme Court's holding in *Chapman v. California*, 386 U.S. 263, 87 S.Ct. 229, 17 L.Ed.2d 705 (1967) and its progeny. Explicating its holding in *Chapman*, the Supreme Court in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) held that the error in admitting or excluding evidence is harmless if an average jury "*would not have found the State's case significantly less persuasive*" had the complained of evidence been admitted or excluded. Viewing the State's case during both the offense and punishment phases of the trial in the entirety, we are compelled to hold that its case would in fact have been significantly less persuasive had Father Manning not testified as he did or, for that matter, had the petitioner himself not testified in the manner alluded to above. In a case such as this where the petitioner has been condemned to death, we believe that effective assistance of counsel is a "constitutional right so basic to a fair trial that [its] infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. at 23, 87 S.Ct. at 827–828, 17 L.Ed.2d at 710. See also *Holloway*

---

**27.** The State ruefully remarks, "The fact that the witness did not testify exactly as anticipated by petitioner's counsel did not establish ineffective assistance of counsel." But the problem is that one cannot safely surmise just what counsel anticipated since the witness attested there was no basis for any expectation.

*v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Powell v. Alabama,* supra.

Tainted at the start by solicitation, errant in investigative method, unheeding of directions to available germane witnesses, slothful in preparation for and unexplainable in conduct at trial, assistance of counsel in this case was never effective–findings of the habeas court to the contrary notwithstanding.

## V.

 Finally, there is the matter of the habeas court's findings of fact and conclusions of law filed on June 4, 1979, in which it is recommended that relief be denied. Of course, this Court is not bound by the findings of the habeas court in a post–conviction habeas corpus proceeding. *Ex parte Harris,* 593 S.W.2d 330 (Tex.Cr.App.1979); *Ex parte Cantrell,* 571 S.W.2d 33 (Tex.Cr.

App.1978); *Ex parte Rains,* 555 S.W.2d 478 (Tex.Cr.App.1977). In concluding that performance of counsel did not fall below that standard mandated by the Sixth Amendment through the Fourteenth, the habeas court found as a "fact" that:

"Such counsel, in this case . . . seemed to follow the *tactic* in the case of attempting to save the defendant from the death penalty, *to the exclusion of preserving legal points at the time.* Under the circumstances of this case, *this may not be an unreasonable approach. At any rate the trial was not a farce or mockery of justice in any sense of the word.*"

As indicated *ante,* for its part the State insists that what might be viewed as failings of trial counsel, as we have, are in realty the consequences of trial strategy or tactical decision. We have not addressed the matter of a strategy that rules out "preserving legal points" in this capital case, but do examine it in the margin to provide the setting for evaluating the contentions made by the State.[28]

---

**28.** The record reflects, and opinion of the Court on direct appeal tersely notes, that virtually all potential reversible error in the trial court was not preserved because Conant repeatedly failed to object or request the proper relief when he did object. See *Duffy v. State,* supra at 201 (swearing of jury); at 204 (form of the charge); at 205 (sidebar remark by prosecutor); at 206 (improper jury argument by prosecutor). Others were characterized by the habeas court as "the exclusion of preserving legal points at the time," and the result is a concerted waiver of potentially reversible error. That trial strategy explains silence, especially in a context as compelling as a capital murder trial where the supreme penalty looms large, is a strange concept. Moreover, trial counsel's testimony at the habeas hearing regarding his habitual failure to object reveals that the "trial strategy" argument is devoid of merit in this regard:

Q [By Mr. Goldstein]: Mr. Conant, could you explain why, *if there is a reason,* you failed to make any objections at any time during the course of jury selection or trial and the record is silent with respect to the selection of prospective jurors and any oath they may have taken?
A: No, sir. *I can't explain that.*
Q: Can you explain why, if at all, you acquiesced in and made no objection to the charge given by the Court in this cause?
A: *I felt* the charge was correct under the law, Mr. Goldstein.

Q: Can you explain why you did not request further relief with regard to sidebar remarks by the prosecutor that you objected to and left in the record in the state of an affirmative ruling by the trial court, asking no instruction, not moving for a mistrial, so that no error was preserved with regard to trial sidebar remarks made by the prosecutor in this cause?
A: No, sir. *I can't explain that.*
Q: Can you explain why you made no objection to the prosecutor's statement referring to this trial as an important case and the prosecutor's statements in the intimating [sic] familiarity with the victim's family?
A: Mr. Goldstein, I don't know if you are reading from the record or what you are doing. *I am not sure that I recall these statements being made at that time. . .*
That Conant's constant failings were within the realm of trial strategy is difficult to accept but, if they were, he had ample opportunities to say so. That he did not, choosing instead to give no explanation at all, refutes the notion that his performance was "tactical" in nature and reinforces our conclusion that the wounds in this instance were self–inflicted. See *Callaway v. State,* 594 S.W.2d 440, 444–445 (Tex.Cr.App. 1980); *Cude v. State,* 588 S.W.2d 895, 897–898 (Tex.Cr.App.1979); *Ruth v. State,* 522 S.W.2d 517, 519 (Tex.Cr.App.1975) (Morrison, J., concurring).

■ Whether counsel's failure to assert psychiatric defenses was a strategic decision begs the question. It may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed, rational decision. See *Powell v. Alabama*, supra at 58, 53 S.Ct. at 60, 77 L.Ed. at 165; see also *People v. Corona*, supra. Abdication of basic threshold responsibility is the antithesis of a considered strategy to assert or withhold possible defenses. Thus, Conant withdrew psychiatric defenses and mitigating testimony on punishment before he had even examined them.

Though it might be argued that the uninformed decision to place the petitioner on the stand at the offense and punishment stages was a ploy which in hindsight we may not criticize, this argument must also fall. It blinks reality to find that a reasonably effective trial lawyer would, as a matter of tactics in a capital case, decide to put his client on the stand, waive the privilege against self–incrimination, subject him to a potentially brutal cross examination–all without taking the trouble to find out that his client is incapable of telling the truth or that he is being given a massive dosage of a potent tranquilizer which could not help but make a bad situation worse. We will not balance the rights of a maladaptive, possibly insane, twenty five year old accused against convenience of a mature retained attorney, nor condone his brinksmanship in an area that he has not explored for dangers that are there. See *Davis v. Alabama*, supra, at 1221.

■ Surely at some point "tactic" becomes an unsatisfactory justification for ineptness. And where silence which results in waiver of potentially reversible error in almost all respects cannot be explained by the practitioner, we are not warranted in excusing his major derelictions. The justifications advanced by the State–in its own

hindsight–must be rejected. Ineffectiveness disguised as strategy ultimately unmasks itself.

The second conclusion of law made by the habeas court reads in its entirety:

"Recent rulings of the Court of Criminal Appeals held that where the Petitioner hired a counsel to defend him in a criminal case, he cannot contend that he was represented by ineffective counsel. *The rule may be otherwise if the trial is a farce or a total miscarriage of justice,* which this trial was certainly not."

We know not to which "recent rulings" the habeas court had in mind on June 4, 1979 when reaching that legal conclusion, but the "farce and mockery" gauge has not been recognized as the correct standard for *appointed* counsel in this State since 1967, see *Caraway v. State*, 417 S.W.2d 159 (Tex. Cr.App.1967),[29] and has *never* been the correct test for gauging effectiveness of *retained* counsel–until *Ewing*, supra, it was "breach of a legal duty."

### VI.

In *McMann v. Richardson*, supra, the Supreme Court insisted:

"[I]f the right to counsel [as] guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel..."

397 U.S. 759, 771, 90 S.Ct. at 1449, 25 L.Ed.2d at 773.

A decade before, Judge Davidson for the Court presaged this sentiment when he wrote:

"[W]hen from the entire record is is apparent that the accused has not been adequately represented the court should have no hesitancy in so saying."

*Rodriquez v. State*, 340 S.W.2d 61, 63 (Tex. Cr.App.1960).

We are not unmindful of the brutal offense which the evidence amply shows this petitioner committed. But the only issue before us at this juncture is whether this

**29.** That *Caraway v. State*, supra, is the turning point is confirmed by *Ex parte Gallegos*, supra, at 511, albeit thereafter "farce and mockery" language occasionally "crept into some of our opinions," *id.* at 512.

petitioner was "left to the mercies of incompetent counsel," incompetent in the sense that his purported assistance was unreasonably ineffective. Because this petitioner is so situated, this conviction and concomitant death penalty cannot stand, and it falls to us to say so. To hold otherwise would be, in the words of Justice Sutherland, "to ignore the fundamental postulate ... that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." *Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158, 172 (1932).

Accordingly, the relief sought is granted and conviction and assessment of death in Cause No. 76–CR–840 are set aside; the petitioner is hereby remanded to the custody of the Sheriff of Bexar County to answer the indictment in the case. A copy of this opinion will be forwarded to the Texas Department of Corrections.

It is so ordered.

ONION, P. J., and DOUGLAS, ODOM, TOM G. DAVIS, DALLY and W. C. DAVIS, JJ., concur in result.