Mickey Thomas HERNANDEZ,
Appellant,

v.

The STATE of Texas, Appellee.

No. 08–95–00187–CR.

Court of Appeals of Texas,
El Paso.

March 13, 1997.

Published in Part Pursuant
to Tex.R.App.P.90.

Thomas S. Morgan, Midland, for Appellant.

Michael L. Fostel, District Attorney, Kermit, for State.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

CHEW, Justice.

Appellant appeals a jury conviction for aggravated sexual assault of a child, in violation of Section 22.011(a)(1)(A) of the Texas Penal Code. The jury assessed his punishment at life imprisonment and a fine of $10,000. Appellant advances five points of error. First, he contends that he received ineffective assistance of counsel. Second, he urges that the trial court erred in refusing to grant him a mistrial because a juror lied on voir dire about knowing the appellant when the juror

not only knew the appellant but was owed money by the appellant. Third, he complains that there was a fatal variance between the victim's name in the indictment and the proof at trial. Fourth, he complains that the trial court erred in admitting evidence of an extraneous offense. Fifth and last, he contends that he was denied a fair trial on punishment because the State asked "have you heard" questions when no reputation testimony by the appellant had been presented. Appellant does not contest the sufficiency of the evidence. We affirm.

## I.

The evidence reflects that at approximately 1 a.m. on August 9, 1993, fourteen-year-old L.B. was asleep in her bedroom when she was awakened by a noise at her bedroom window. Someone sat on her bed, put his hands onto her shoulder and told her that if she spoke, he would shoot her. He said that he had a gun and that he had a lookout outside. In the darkness, she could not see any recognizable features of her assailant. The intruder told her that he had seen her at her boyfriend's home. He knew her boyfriend's name and said that the boyfriend lived across the street from him. He ordered her to get on the floor and take off her shorts and underpants. He then raped her. About thirty minutes after entering L.B.'s bedroom, the assailant ordered L.B. to hold up the blinds so that he could leave through the window. After waiting for a few minutes, L.B. telephoned her boyfriend, then she went upstairs to awaken her parents and tell them she had been raped. Her father immediately called the police.

L.B. was taken to the community hospital soon after the police arrived. She was examined by medical personnel and the medical protocol for rape victims was followed. Blood, saliva, hair, and vaginal swab samples were collected, together with some of the victim's garments. During the examination, she stated that her attacker had first said that he was from Pecos, but then said he was from Odessa.

A fingerprint expert testified that two latent fingerprints lifted from the window pane of L.B.'s bedroom matched the appellant's known right index and small finger. The State also presented testimony of forensic DNA typing of the biological samples taken from the victim which established that there was a match and statistical probability that implicated the appellant as the sexual assailant. A Winkler County Probation Department community supervision officer testified that the appellant was under electronic monitoring on the night in question and the instrumentation had recorded his absence from his home from 1:02 a.m. to 1:41 a.m. on August 9, 1993.

The Appellant presented two alibi witnesses, who testified that they were with the appellant that night. They stated that they all drove to the neighboring town of Jal, New Mexico and back, and that they dropped appellant off at his home at approximately 1 a.m. on August 9, 1993. The Appellant's mother testified that she heard the front door open sometime between 12:30 a.m. and 1 a.m. She also testified that at 1:30 a.m., she got up to check on her daughter and as she did so, she saw her son asleep in his bedroom. Appellant's father testified that his son was not at home at midnight but that the Appellant was at home asleep at 2 a.m., when the father got up to use the bathroom. The father also testified that the electronic monitoring equipment often malfunctioned.

The defense concluded with the introduction of the victim's medical records and the testimony of the emergency room physician in charge of examining the victim following the assault. He testified that the records reflected some findings that could be considered inconsistent with a forcible rape or sexual inexperience.

## II.

The Appellant, in his first point of error, complains that he received ineffective assistance of counsel. His complaint is six-fold. First, he complains that there was a complete lack of pretrial preparation by his trial attorney. Specifically, he alleges that he never saw or spoke with his trial attorney

until the night before trial, that she did not interview his alibi witness until the second day of trial and never personally interviewed any of the State's witnesses. Second, he complains that his trial attorney did not consult with him in the selection of jurors and allowed a juror, who lied about knowing the appellant and was, in fact, the appellant's former bail bondsman, to serve on the jury without a proper challenge. Third, he urges that the trial attorney should have complained about a fatal variance between the victim's name in the indictment and the proof at trial which would have result in a directed verdict. Fourth, he complains that his trial counsel failed to object to improper misstatements of evidence during the State's closing argument. Fifth, he argues that his trial counsel permitted evidence of an extraneous offense to be presented to the jury or, at least, failed to seek or obtain a limiting instruction from the trial court. Finally, he complains that his trial counsel failed to object or seek a limiting instruction when, during the punishment phase, the prosecution asked the Appellant's father: "[H]ave you heard that [the appellant] has two other indictments pending against him for raping two other girls?"

The record on this direct appeal includes the statement of facts from a hearing on the Appellant's Motion for New Trial. The Appellant, his trial counsel, and the Appellant's father testified at that hearing.

We consider a complaint of ineffective assistance of counsel under the standard established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adapted by Texas in *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986). To prevail on an ineffective assistance of counsel claim, the appellant must first establishes that his counsel's representation fell below an objective standard of reasonableness. *Jackson v. State*, 877 S.W.2d 768 (Tex.Crim.App. 1994); *Hernandez*, 726 S.W.2d at 55. The Appellant must then show a reasonable probability exists that a different outcome would have resulted but for his trial counsel's professional errors. *Jackson*, 877 S.W.2d at 771; *Hernandez*, 726 S.W.2d at 55.

In determining whether the *Strickland* standard is met, we review the totality of the circumstance and not just isolated acts or omissions of trial counsel. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App. 1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). The appellant must prove ineffective assistance of counsel by a preponderance of the evidence. *Moore v. State*, 694 S.W.2d 528, 531 (Tex.Crim.App. 1985). We must, however, strongly presume the trial counsel's competence though the appellant can rebut this presumption by showing that his attorney's representation was unreasonable under prevailing professional norms and the challenged action was not sound trial strategy. *Jackson*, 877 S.W.2d at 771.

It is a fundamental duty of counsel to make an independent investigation of the facts of the client's case. *Haynes v. State*, 790 S.W.2d 824, 827 (Tex.App.—Austin 1990, no pet.). This obviously includes conferring with the client, seeking out and interviewing witnesses. *Id.* The trial counsel may not exclusively rely on facts represented in the State's file nor solely on the veracity of the client. *Id.*

On the morning of trial, the trial counsel filed a motion to withdraw. She stated to the trial court:

> I came in and my client and his family had informed me this morning and said that they sought to retain another Counsel. That they no longer needed my services due to too many irregularities, failure to communicate that would prevent further effective communication, further effective representation and I ask, based on those two matters, to be allowed to withdraw.

After the trial court denied the motion, the Appellant repeated his objection. It also appears from the record that for a time, the Appellant refused to return to the courtroom to begin the trial and that a deputy was ordered to bring him in. Then, when the court asked the Appellant to plead to the indictment, the following exchange occurred:

> The Court: Mr. Hernandez, to the charges set out in the indictment,

how do you plead, guilty or not guilty?

Appellant: I'm not guilty, sir, and I'm still not ready to go to trial. I believe that Mr. Fostel has—

The Court: Will the jury retire to the jury room, please. Let me explain to you how it works here, Mr. Hernandez. You're allowed to speak in court when I allow you to speak, okay?

Appellant: Yes, sir.

The Court: When I ask you for your plea, you give me your plea. I'm not interested in any statements or explanations. Do you want to say anything for the record right now?

Appellant: Yes, sir.

The Court: Go ahead.

Appellant: Sir, I just want you to be advised that I've been incarcerated for the past three and a half months and yesterday was the first time this Ms. Plummer presented herself to me—I didn't know her, she didn't know me, she knows nothing about me. And this is less than twenty-four hours and she wants to take me, she wants to go to court. And I feel we're not communicating right and I don't want her as my lawyer.

The Court: Anything else?

Appellant: No, sir.

The Court: Okay, anything else?

Ms. Plummer: Yes, sir. Judge, just that a[sic], he had formally put forth the Motion to Withdraw. I have talked to my client. That was this morning and the Court denied that Motion and I'm going to put that Motion before the Court again. I talked to my client previously to this, to our reconvening, that is, prior to opening arguments. *He is concerned about the way I han-*

*dled his case, about the strategy I pursued. We've had many discussions about whether certain witnesses should be called and which ones should not be called and I've had those same discussions with his family.* This morning, I found that they had retained another attorney and signed a contract with another attorney and paid a retainer to that attorney, something they have not done with me.

Also, Your Honor, that was, when I talked to Mr. Hernandez about, you know, the trial strategy and objections and such things, he has again those objections and that basically, that *he's not been able to help me through this trial, because he disagrees with me being his attorney, number one. And number two, the way that I'm pursuing this,* and so I don't know, Your Honor, truthfully and as an officer of the court where I can effectively represent Mickey Thomas Hernandez, *given his current attitude* and we'd ask the Court to reconsider that Motion for Withdrawal as an attorney and let Mr. Hernandez have the attorney that he wants. [Emphasis added].

.  .  .  .  .

The Court: If there were problems with you and your client, I would have expected them to surface before, the night before the trial and I didn't hear anything about that last week, last month, any time prior to that and I'm not going to continue this case again on the eve of trial, well, I'm just not going to do it, so your Motion for Withdrawal that is reasserted is denied.

Ms. Plummer: Is there anything else you want to say, Mr. Hernandez?

Appellant: I just want to say that I'm not ready, sir. That I don't want this attorney as my lawyer. I don't want, I don't want her, it's common sense, twenty-four hours that this is my life

we're talking about. This is like twenty-four hours, less than twenty-four hours, she's going to come and represent herself to me, and I ask just one question about the Court.

The Court: Did these problems arise you [sic] to start having problems with her just yesterday or did you have problems with her last week?

Appellant: I've never seen her before. I've been in here for three and a half months already. She has not tried to come and talk to me.

Ms. Plummer: *That is part of the communication problem that we allude too [sic], Your Honor, about not responding to our calls or letters and not being—it's up to the Court,* .... [Emphasis added].

Though not evident in the cold record, the Appellant's "attitude" apparently continued throughout the remainder of the trial. This is evidenced by the telling comment of the State during closing argument in the punishment phase: "[T]hink about of the way [the Appellant] conducted himself through this trial, talking ugly to his lawyer the whole time, that's the lady that's up here trying to save his life and he mistreated her through the whole trial, right here in front of you, the jury."

The hearing on the Appellant's Motion for New Trial provides a sharp and disturbing contrast to the commentary of the Appellant's counsel at trial, most of which we have set out above. The trial counsel testified that she was hired by the Appellant's family in November 1994 (the family said it was August 1994). At that time, the Appellant was somewhere in the Texas prison system. The trial counsel remembered that she had sent "some correspondence" to the Appellant during that time period but that she never received a response from him. In February 1995, the Appellant was returned to the Winkler County Jail to stand trial that month. The trial counsel testified that she

was unaware that he had been returned to Kermit until his family called her to ask for a continuance due to the death of the Appellant's sister. The trial counsel did file the continuance motion, and the trial was rescheduled until May 30, 1995. The trial counsel did not visit the Appellant until the evening of May 29, the night before trial.

The trial counsel explained that her office regularly sent letters, bills, and trial notices to the Appellant, though she added that most probably they went to his family, and that it was her practice to include a notice that clients were invited to call her collect. The trial counsel further stated that she had communicated with the Appellant to tell him and his family that there were "serious problems in the case and serious problems regarding the bill and serious problems regarding witnesses...." She further testified that in May 1995, she placed two telephone calls to the Appellant in jail. The first, in mid-May, was to tell him that she was considering withdrawing from the case. The second was in the afternoon of May 29. The trial counsel stated that the Appellant returned only the second call.

The trial counsel's first personal visit with the Appellant, on the night before trial, lasted about an hour. During this interview, she obtained the addresses of the Appellant's two alibi witnesses. Subpoenas for these witnesses were issued on the first day of trial, but she did not talk with them until the second day of trial. The trial counsel characterized the interviews as "extensively." When asked why she did not interview the witnesses earlier, trial counsel testified that she did not consider the alibi defense a "very viable defense and ... I presented the defense only at the request of [the Appellant]."

When queried about the scope of her pretrial investigation and witness interviews, she testified that she had received copies of everything she asked for from the State's files. She did not remember personally talking to any of the State's witnesses. She said she was not sure but that her office staff members may have tried to talk to some of the

State's witnesses and that they might have spoken with the Appellant's probation officer. She stated that the victim did not want to be interviewed.

■ The trial counsel's statement above, that she did not think that the alibi defense was viable and that she put it on only at the Appellant's insistence is belied by her brief opening statement. She stated:

There are going to be two very important witnesses, they're friends of Mickey Thomas Hernandez. They're going to say there is no way could he be the person, because one, [L.B.] couldn't identify him and he just doesn't fit whatever profile, but two, that he was somewhere else. That he was somewhere else at the time and it couldn't happen.

At the hearing on the Motion for New Trial, the trial counsel maintained that she had three defensive theories. Apart from the alibi defense, the other two were ( 1) "rebuttal of scientific evidence," which we take to be as challenging the DNA testing and fingerprints, and (2) "medical evidence," which we assume to refer to the lack of physiological signs of a forcible rape, and which seems to imply a defense of consent.

The trial record reflects that the trial counsel made no effort to challenge the reliability and relevance of the DNA evidence. She did not require the State to prove up reliability by showing (1) the validity of the underlying scientific theory, (2) the validity of the technique applying the theory, or (3) the proper application of the technique in the instant case to the trial court outside the presence of the jury. *See Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992); *also Massey v. State,* 933 S.W.2d 141, 152 (Tex. Crim.App.1996). The trial counsel's effort to "rebut" the scientific evidence was limited to her cross-examination of the State's DNA expert. Trial counsel elicited nothing from the exchange that had not already been admitted by the State's examination, that is, that the test could not positively prove that the Appellant had sexually assaulted the victim.

On the last day of trial, the Appellant's trial counsel introduced the hospital records pertaining to the victim's medical examination immediately following the reported rape. The emergency room doctor then took the stand. The record reflects that the medical records and physician were subpoenaed by the defense on the second day of trial. Neither the nurse practitioner, who performed the examination and took the biological samples, nor the attending nurse were called to testify. The doctor testified that the medical records indicated the victim did not have any physical trauma that is generally caused by a forcible rape. A rape questionnaire, in a section titled "Evidence of Vaginal Penetration," records that there were "No tears, No lacerations, No scars, No scratches or bruises." Similar commentary can be noted in other sections of the medical records. The trial counsel did not elicit the recording of the victim's quoted statement that the attacker had told her, first that he was from Pecos and then later from Odessa. Nor was there any elicitation about the seeming doubt expressed in the progress notes dictated by the nurse practitioner as to whether the victim was indeed the victim of a rape.

Considering the totality of the circumstances, we think it abundantly clear that trial counsel tried this case blind. Though her professional performance at trial may be considered mechanically adequate, that is, she asked questions and elicited some favorable answers, made objections and motions in a manner to be expected of a seasoned trial attorney, the totality of her representation was deficient and inadequate. Many good words were spoken, but to little purpose.

The obvious result is the absence of any kind of a cogent defensive strategy or theory. In the opening statement, the Appellant's trial counsel tells the jury that there are "two very important witnesses" that provide him with an alibi and alludes to some other vague theory that the victim can not identify the Appellant and that he "doesn't fit whatever profile." In contrast, by the end of the trial, the trial counsel appears to have shifted the focus to the elemental defense of consent by

the victim. "Abdication of basic threshold responsibility is the antithesis of a considered strategy to assert or withhold possible defenses." *Ex parte Duffy,* 607 S.W.2d 507, 526 (Tex.Crim.App.1980). We conclude that the representation of the Appellant by his trial counsel fell below an objective standard of reasonableness under prevailing professional norms.

In *Strickland,* the Supreme Court held that in order to make out a Sixth Amendment claim of ineffective assistance of counsel, the defendant must show that his attorney was deficient, and that:

> [T]he deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

Elaborating on the latter, "prejudice" prong of ineffective counsel, the Court observed that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697. Instead, the defendant must show that:

> [T]here is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.[1]

We are obliged to find that the inculpatory nature of the DNA test results, supported by proof of the Appellant's fingerprints at or near the crime scene and the electric moni-toring recording of the Appellant's absence from his home are too overwhelming to find that the result of the guilt-innocence phase would have been different. There is nothing in the record to indicate that the Appellant's stance was anything other than complete denial of the act. The record does suggest that consent could have been a contestable issue; however, the alibi defense, though it is not necessarily incompatible with a consent defense, certainly does not support that issue. The record is simply insufficient to consider the impact, if any, of the trial counsel's failure to adequately develop the elemental defense of consent. Therefore, insofar as the guilt-innocence phase, the Appellant has failed to meet his burden of establishing a reasonable probability that the result would have been different.

■ In *Ex parte Cruz,* 739 S.W.2d 53, 58 (Tex.Crim.App.1987), the Court of Criminal Appeals held that the second prong of *Strickland* is not applicable to the punishment phase of trial. The courts should apply, instead, the single standard of reasonably effective assistance of counsel as gauged by the totality of the circumstances. *Ex parte Duffy,* 607 S.W.2d at 514. The appellant must still show the harm due to the alleged ineffective assistance. *Stone v. State,* 751 S.W.2d 579, 582 (Tex.App.—Houston [1st Dist] 1988, pet. ref'd).

■ When reviewing trial counsel's representation under *Duffy,* though it is only applicable to the punishment phase, it is still necessary to consider the "totality of the representation" of the accused which includes pretrial, guilt-innocence, and the punishment phases. *Ex parte Walker,* 777 S.W.2d 427, 431 (Tex.Crim.App.1989); *Alfano v. State,* 780 S.W.2d 494, 496 (Tex.App.—Corpus Christi 1989, no pet.).

1. Though the Supreme Court characterized "prejudice" as a "general requirement," the Court also noted that in some circumstances such as the actual or constructive denial of counsel altogether at a critical stage of the criminal proceeding, prejudice is presumed. *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697. This case, in the author's opinion, war-rants a presumption of prejudice in lieu of the second prong. However, the constraints of current Texas jurisprudence requiring the second prong preclude this Court from exercising that presumption. *See Hernandez,* 726 S.W.2d at 57 and *Butler v. State,* 872 S.W.2d 227, 241 (Tex. Crim.App.1994).

We think it unnecessary to recap or to continue giving examples of the trial counsel's deficiency. As we have tried to emphasize, the trial counsel's professional performance at trial certainly evidences experience and general trial competence. The trial counsel's failure to prepare for trial clearly impacted on all phases of the trial. When the jury assessed the Appellant's punishment, they possessed information that the Appellant had raped a fourteen-year-old girl, that he was on electronic monitoring, and that he had been indicted for raping two other girls. But for the State's commentary during his closing, the record would be silent about the Appellant's "attitude" towards his trial counsel during the course of the trial. It is, however, unnecessary to determine what, if any, impact his "attitude" had on the jury. We have concluded that under the totality of the circumstances, that the Appellant has sufficiently met his burden under Duffy that his trial counsel was unreasonably deficient. We sustain, in part, Point of Error One.

The discussion of the remaining points of error do not meet the criteria for publication, Tex.R.App.P.90, and thus ordered not published. We therefore affirm the Appellant's conviction; however, because we determined that Appellant was denied adequate counsel during the punishment phase of his trial, we reverse and remand for a new trial on punishment.