Kenrick Tremaine JONES a/k/a
Kenrick T. Jones,
Appellant,

v.

The STATE of Texas.

No. 2–00–477–CR.

Court of Appeals of Texas,
Fort Worth.

March 25, 2004.

Suzanne Hudson, Arlington, for appellant.

Tim Curry. Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, Sylvia Mandel, David Kleckner, Mick Meyer, Asst. Crim. D.As., Fort Worth, for appellee.

Panel B: DAUPHINOT, HOLMAN, and SUE WALKER, JJ.

## OPINION ON REMAND

SUE WALKER, Justice.

On original submission, we held that trial counsel was ineffective for failing to call any witnesses on Appellant's behalf, including alibi witnesses counsel admitted that Appellant had told him about when counsel was retained over six months before trial. *See Jones v. State*, No. 02–00–477–CR (Tex.App.-Fort Worth March 28, 2002) (not designated for publication) (attached hereto as Appendix A). On the State's petition for discretionary review, the court of criminal appeals reversed this court's judgment. Five members of the court held that counsel's failure to interview, investigate, or serve subpoenas on

alibi witnesses who testified at a motion for new trial hearing that Appellant was playing dominoes with them at the time of the offense, did not establish deficient performance by counsel. *State v. Jones*, No. 678–02, 2004 WL 231309, at *10 (Tex.Crim. App. Jan.28, 2004) (Hervey, J. joined by Keller, P.J., Meyers, Keasler and Cochran, JJ.) ("It was reasonable for trial counsel to forego the alibi defense.") Four members of the court of criminal appeals, concurring with the majority, would have held that counsel's performance was deficient but that Appellant failed to satisfy *Strickland's*[1] second ineffectiveness prong, that is, failed to show that but for counsel's deficient performance the outcome would likely have been different. *Id.* at *11 (Price, J. concurring, joined by Johnson and Holcomb, JJ.) (Womack, J., concurring in separate opinion). Because our original opinion found trial counsel ineffective based on Appellant's first ineffectiveness complaint—the failure to investigate and present the alibi defense—we did not address Appellant's second ineffectiveness complaint—trial counsel's failure to investigate employment records which would have allegedly established that Appellant was at work during the commission of an extraneous robbery which the State introduced at punishment. The court of criminal appeals has remanded that issue to us for "consideration consistent with" their majority opinion.

Applying the court of criminal appeals majority opinion's analysis to Appellant's second ground of ineffectiveness, we hold that it was reasonable for trial counsel to forego the alibi defense concerning Appellant's employment records. We further hold that Appellant has failed to show that but for counsel's failure to investigate his employment records the result would have been any different. *See Strickland*, 466

---

1. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

U.S. at 694, 104 S.Ct. at 2068. We overrule the balance of Appellant's second and third points.

We affirm the trial court's judgment.

## APPENDIX A

[Delivered March 28, 2002]
### OPINION

### I. INTRODUCTION

Kenrick Tremaine Jones a/k/a Kenrick T. Jones ("Jones") appeals his conviction for aggravated robbery with a deadly weapon, to-wit: a firearm. Jones raises three issues on appeal: (1) that the trial court erred in admitting evidence of an extraneous offense during the guilt/innocence phase of the trial; (2) that his trial counsel was ineffective by not diligently investigating and presenting his alibi defense during trial; and (3) that the trial court erred in denying his motion for new trial. We sustain Jones's second and third issues and hold that, at the hearing on his motion for new trial, Jones established both prongs of the *Strickland* test for ineffective assistance of counsel and therefore was entitled to a new trial. We will reverse and remand.

### II. BACKGROUND FACTS

On October 31, 1999, Michael Brooks ("Brooks"), a Domino's Pizza delivery man, was robbed in Fort Worth at gunpoint by two men. The two men took Brooks's wallet containing a "[d]ebit card, Texaco credit card, and probably half a dozen other credit cards." On November 1, 1999, the day after the robbery, a man later identified as Jones used one of Brooks's credit cards at a Just For Feet store in Richland Hills. Jones was arrested for the October 31, 1999 robbery of Brooks and charged with aggravated robbery with a deadly weapon.

During an interview with Detective John Livesay on November 19, 1999, Jones gave a hand-written statement admitting his use of a stolen credit card at the Richland Hills Just For Feet store. In his statement, Jones explained that on November 1, 1999, "I found a wallet near the dumpster. I opened it to find inside a credit card, ID's, etc. I kept the credit card and discarded the rest into the dumpster." He then admitted to driving with friends to Just For Feet and using the card to purchase multiple pairs of shoes. At no point during the interview with Detective Livesay did Jones admit involvement in the aggravated robbery.

The jury found Jones guilty of aggravated robbery with a deadly weapon, and the trial court sentenced him to ten years' imprisonment. Jones filed a motion for new trial raising ineffective assistance of counsel. The trial court conducted a hearing on Jones's motion for new trial and, after several days of testimony, overruled it. This appeal ensued.

### III. THE TRIAL

The State called three witnesses during the presentation of its case-in-chief: Lakesha Houston, a woman who accompanied Jones to the Just For Feet; Robert Daniel Abbott, a detective with the Fort Worth Police Department in charge of investigating a series of robberies involving pizza delivery men; and the victim, Michael Wayne Brooks.

Lakesha Houston testified first. She stated that she met Jones on November 1, 1999, when a friend introduced him to her as "Michael Brooks." That evening, she drove Jones and two other friends to Just For Feet, and all four of them commenced shopping. Houston testified that after they had finished shopping, she observed Jones pay for all of their items with Brooks's credit card. According to Hous-

ton, the total bill amounted to approximately $500. Houston said that she did not know that Jones was using a stolen credit card to make the purchase, but that days later she began to suspect as much. Consequently, she went back to Just For Feet to return the shoes that Jones had bought for her and to inform the store manager that she thought the shoes had been purchased through a fraudulent transaction. At trial, Houston looked at several still photographs taken by the Just For Feet security camera and identified Jones as the person depicted paying the store's cashier and then leaving the store with shopping bags in tow.

Detective Robert Abbott testified after Houston. He stated that he showed Michael Brooks six photographs of individuals with similar features and asked Brooks if he recognized any of them as the men who robbed him. Brooks selected a photograph of Jones. Detective Abbott took Jones into custody the next day.

Michael Brooks was the State's final witness. He explained that on the evening of October 31, 1999, he was walking back to his car after delivering a pizza when two men approached him, pushed him against the side of his car, and placed a "gray automatic" weapon to his neck. According to Brooks, only one of the two robbers had a gun. Brooks testified that he twice managed to glimpse the robbers' faces. First, Brooks turned his head while he was shoved against the car. He testified he saw "one face at that point." The robbers then forced Brooks from the side of the car to a face-down position in the grass, where they began to rifle through his pockets. At that time, Brooks twisted his head over his shoulder and glanced at both robbers. Brooks said he got a "good look" at the robbers because a street light ap-

proximately "50, 75 feet on the other side of the road" cast some light in the area.

Jones's trial counsel impeached Brooks on cross-examination. Counsel first established that a man named Billy Don Smith already had been convicted of this robbery as one of the two robbers. Counsel then asked Brooks if Jones had been the gun-wielding robber. When Brooks responded affirmatively, counsel showed him a copy of a statement that he had given to a detective during the investigation of Billy Don Smith. In that statement, Brooks had identified Billy Don Smith as "the one that had the gun." Counsel also elicited testimony from Brooks confirming that, on the night of the robbery, he had told a police officer that one of the robbers was between the ages of sixteen and eighteen, and that the other was between the ages of twelve and thirteen. When Brooks later met with a detective and picked Billy Don Smith's photograph out of a lineup, he identified Smith as the sixteen-to-eighteen-year-old robber. The twelve-to-thirteen-year-old robber therefore remained at large. Jones is a twenty-year-old man.

After Brooks testified, the State closed its case-in-chief. In turn, Jones's counsel indicated that the defense was going to rest without calling any witnesses or presenting any evidence. Jones responded to his counsel's announcement by stating, "[h]old on a second." After a pause in the proceedings, during which Jones had the opportunity to confer with his attorney, the trial court questioned Jones:

THE COURT: Your attorney has indicated that he intends to rest behind the State and attack their case as a defense rather than put on affirmative evidence. Is that okay with you?

THE DEFENDANT: Yes, Your Honor. The defense rested. The next day, the jury returned a guilty verdict.

### IV. MOTION FOR NEW TRIAL HEARING

Five people testified at the hearing on Jones's motion for new trial: Jones's trial counsel; Ron Pendergraf, Jones's appellate counsel's investigator; Sheila Gordon, an alibi witness; Michael Franklin, an alibi witness; and Jones. Jones's trial counsel testified that he made his first appearance in the case on March 3, 2000, eight months before trial. He explained that at that time Jones had provided him with the names of three alibi witnesses: Sheila Renae Gordon, Debra Woods,[2] and Lloyd Turner. Of those three witnesses, trial counsel's investigator was only able to locate Woods. Counsel acknowledged that he did not attempt to subpoena any of these alibi witnesses until two days before trial. Two days before trial, he had subpoenas issued for Woods, Gordon, and Turner. None of the subpoenas were served. Counsel explained that Woods was not served because she failed to meet counsel's investigator at a pre-arranged time. When asked why he chose to rest Jones's defense rather than move for a continuance to secure the testimony of these alibi witnesses, counsel responded, "we made [the] strategic decision ... that we stood a good chance that the State didn't put on enough evidence to find the Defendant guilty." Counsel stated that he and Jones had "carefully" weighed the decision not to seek a continuance, and that Jones ultimately had agreed with the strategy of not putting on an alibi defense.

Ron Pendergraf, the investigator used by Jones's appellate attorney, testified next. He stated that the trial court had appointed him to this case in early January 2001, allowing him roughly two weeks before the motion for new trial hearing to investigate the three alibi witnesses named by Jones. In those two weeks, Pendergraf had some difficulty locating the witnesses. He determined Sheila Gordon's residence and left his business card there. He also determined that there was a "good possibility" that he could locate the remaining two alibi witnesses if given additional time.

The trial court took a brief recess and then the defense called Sheila Gordon. Gordon explained that she was incarcerated in the Tarrant County jail and that she had been subpoenaed to the hearing. She testified that she and Jones were living together in October 1999. She stated that on the night of the aggravated robbery, her five children went trick-or-treating while she and Jones stayed home playing dominoes.

Gordon explained that sometime between Thanksgiving and Christmas of 1999, a detective came to her house and questioned her about Jones's whereabouts on the night of the aggravated robbery. Gordon could not remember the detective's precinct, however she testified that he had displayed his badge for her and carefully glanced around the inside of her house while he conducted the interview. Gordon said that she had cooperated with the detective and told him that Jones had been with her during the entire night of October 31, 1999. She noted that the detective did not ask her to give a written statement nor require her to go to the police station.

When asked if she knew that Jones's trial counsel had a subpoena issued for her to appear and testify at Jones's trial on November 8, 2000, Gordon replied that she had not been aware of that fact, but added that she would have been willing to testify on that date had she been notified or been served with the subpoena. Gordon said that had she testified at Jones's trial, her

---

**2.** The record before us inconsistently refers to this witness as Debra Wood and Debra Woods. For purposes of this opinion, we refer to her as Debra Woods.

testimony would have been the same as the testimony she provided at the motion for new trial hearing.

Because Pendergraf informed the court that there was a "good possibility" that he could locate the remaining two alibi witnesses, Woods and Turner, if he were given additional time, the court recessed the motion for new trial hearing. A week later, the court reconvened the hearing. The defense called Michael Franklin. Franklin's name was mentioned by Gordon as someone present at her apartment on October 31, 1999, the evening the robbery of Brooks occurred. Franklin testified he had known Jones for eight years and was with him in Gordon's apartment on Halloween 1999. Franklin testified that Woods and Turner were also present. Franklin said that he was not contacted by Jones's trial counsel or by counsel's investigators, but that he would have been willing to testify at Jones's trial if he had been called as a witness.

The defense next recalled Ron Pendergraf. He testified that, during the one-week recess of the hearing, he had located Michael Franklin and had located Lloyd Turner's place of business. He testified that he was still looking for Debra Woods.

Finally, Jones testified. He stated that "from the beginning" he had identified Sheila Gordon, Debra Woods, and Lloyd Turner as alibi witnesses that his trial counsel should call to testify at trial. Jones said that he had emphasized Gordon's name in particular because in 1999 he was "always at the house" with her. According to Jones, his trial counsel never asked him to meet with investigators in an effort to locate Gordon, Woods, or Turner. Indeed, he claimed that it was two to three days before trial when the investigators finally sought his assistance in finding the three witnesses. Jones noted that he had

encountered Woods the morning before jury selection and that she had acknowledged her arrangement with investigators to be served with a subpoena and to testify at Jones's trial. Though Woods failed to meet the investigators or to appear at trial, Jones asserted that he could have located her again had his counsel moved for a continuance rather than resting without putting on a defense.

Jones testified that he was surprised his trial counsel never called any witnesses because alibi witnesses always had been a part of their discussions about his case. He also said that he did not know that his trial counsel could have moved for a continuance when his alibi witnesses failed to appear. At the motion for new trial hearing, Jones's appellate attorney questioned Jones about his discussion with his trial counsel during the pause in the proceedings after the State had rested.

Q. Did [trial counsel] present it as an option that you could rest or call witnesses, or did he present it as this is how it is going to happen, we're not going to call witnesses, there's not really a choice?

A. There's not really a choice.

Q. So was he really asking you to agree to this or just telling you how it was going to happen?

A. He just told me exactly how it was going to happen.

When asked during cross-examination why he did not speak out against counsel's decision to rest and request that he move for a continuance, Jones replied, "At that point in time, I didn't know anything about we could get a continuance [sic], so if I don't know, how could I be sitting here saying I want a continuance?" Jones further explained that he did not realize he could ask the trial judge for clarification if he did not understand something that transpired during his trial. For instance, at the hearing,

the judge honed in on the moment at trial when Jones, having conferred with his counsel, stated in open court that he had agreed to rest his case.

> Q. You didn't ask me any questions or say that you had concerns or anything at that time; is that correct?
>
> A. Correct.
>
> Q. Is that because based on the information you had, you didn't have any concerns at that time since you didn't know you could ask for a continuance?
>
> A. I had concerns, but I was not sure how to express them.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

We apply a two-pronged test to ineffective assistance of counsel claims. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999). First, appellant must show that his counsel's performance was deficient; second, appellant must show the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689, 104 S.Ct. at 2065.

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable. *Id.* at 687, 104 S.Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* at 697, 104 S.Ct. at 2070.

Generally, the trial record will not be sufficient to establish an ineffective assistance of counsel claim. *Thompson*, 9 S.W.3d at 813–14; *Kemp v. State*, 892 S.W.2d 112, 115 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd). This is true because normally a silent record cannot rebut the presumption that counsel's performance was the result of sound or reasonable trial strategy. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2052; *Mallett v. State*, 65 S.W.3d 59, 63 (Tex.Crim. App., 2001); *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). However, a defendant may rebut the presumption by providing a record affirmatively demonstrating the alleged ineffectiveness. *Mallett*, at 63; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim. App.1994); *Bohnet v. State*, 938 S.W.2d 532, 536 (Tex.App.-Austin 1997, pet. ref'd). This record may be provided by a motion for new trial hearing. *Courtney v. State*, 39 S.W.3d 732, 735 (Tex. App.-Beaumont 2001, no pet.) (holding that record of counsel's ineffectiveness developed at hearing on defendant's motion for new trial).

Jones contends that his trial counsel was ineffective for failing to diligently investigate and present his alibi defense during trial.[3] We first must determine whether, in light of all the circumstances and the professional norms at the time, counsel's decision to rest Jones's defense rather than move for a continuance to present an alibi defense amounts to deficient performance under the first *Strickland* prong.

## A. *Strickland's* First Prong: Deficient Performance.

Counsel has the duty to make an independent investigation of the facts and circumstances of the case by seeking out and interviewing potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 395–96 (Tex. Crim.App.1990); *Ex parte Ybarra*, 629 S.W.2d 943, 946 (Tex.Crim.App.1982); *Ex Parte Duffy*, 607 S.W.2d 507, 517 (Tex. Crim.App.1980), *overruled on other grounds by Hernandez v. State*, 988 S.W.2d 770 (Tex.Crim.App.1999); *Butler v. State*, 716 S.W.2d 48, 54 (Tex.Crim.App. 1986). Once counsel has investigated the facts and developed a defensive theory, counsel is obligated to present sufficient available evidence in support of that defensive theory. *See Duffy*, 607 S.W.2d at 518; *Butler*, 716 S.W.2d at 54–55; *Shelton v. State*, 841 S.W.2d 526, 527 (Tex.App.-Fort Worth 1992, no pet.).

The failure to adequately investigate or to present an alibi defense has been held to constitute ineffective assistance of counsel on many occasions. *See Butler*, 716 S.W.2d at 55–56 (counsel failed to interview or call known fact and alibi witnesses or investigate other exculpatory evidence); *Shelton*, 841 S.W.2d at 527 (counsel failed to call alibi witness); *Doherty v. State*, 781 S.W.2d 439, 442 (Tex.App.-Houston [1st Dist.] 1989, no pet.) (counsel failed to subpoena any witnesses, failed to investigate a different possible suspect, an alibi witness, and fact witnesses); *see also Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex.Crim.App. 1983) (counsel spent only minutes preparing for trial, did not conduct any investigation or call any witnesses); *Haynes v. State*, 790 S.W.2d 824, 827 (Tex.App.-Austin 1990, no pet.) (counsel did not interview available, beneficial defense witnesses and did not visit scene of offense). The burden is on the defendant to show that the purported alibi witnesses were available and that their testimony would have been helpful to him. *King v. State*, 649 S.W.2d 42, 44 (Tex.Crim.App.1983) (holding that failure to call a witness may support ineffective assistance of counsel claim only if it is shown witness was available and defendant would have benefited from testimony); *see also Butler*, 716 S.W.2d at 55 (same).

We presume defense counsel provided reasonable professional assistance and that his actions might be considered sound trial strategy. *Jackson*, 877 S.W.2d at 771. We examine the record to determine whether Jones has rebutted this presumption by providing a record from which we can determine that trial counsel's performance was not reasonable under the circumstances and prevailing professional norms or based on sound trial strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. We also examine the record to determine whether Jones has established

---

3. Jones also argues that his trial counsel was ineffective at punishment because he failed to obtain Jones's work records to show that Jones was at work at the time another unindicted pizza-delivery-robbery extraneous offense occurred. The State called the victim of this robbery to testify at punishment. Because we hold that trial counsel's decision to forego Jones's alibi defense was below the standard of professional norms and undermined the reliability of the jury's verdict, we do not address this issue.

that the alibi witnesses were available and that their testimony would have been helpful to him. *See Salinas v. State*, 773 S.W.2d 779, 782 (Tex.App.-San Antonio 1989, pet. ref'd).

The record reflects the following testimony by Jones's trial counsel at the motion for new trial hearing:

Q. Do you recall when you were retained on this matter?

A. I can't recall exactly the month and time . . . but I believe it was at least six months prior.

Q. Now, in preparing for the trial, did you develop through interviews with my client or other people a list of possible alibi witnesses?

A. We went over the possibility of alibi witnesses, yes, but we didn't prepare a list.

Q. I'm sorry, I'm sorry. I actually meant prepared in your mind. Were you aware of some witnesses?

A. Yes.

Q. Did you, in fact, attempt to locate through investigators three alibi witnesses named Sheila Renae Gordon, Debra Woods and Lloyd Turner?

A. Yes.

Q. All right. And were your investigators successful in locating any of these three witnesses?

A. Yes, one witness.

Q. And who was that?

A. I believe that was—if you can remind me of the names again.

Q. Sheila Renae Gordon, Debra Woods or Lloyd Turner.

A. I believe we located Woods.

Q. Okay. And the—the basis of the alibi theory was that the Defendant was with these three individuals on the night

and at the time of the alleged aggravated robbery; is that correct?

A. Yes.

Q. And they would testify as to that; is that correct?

A. Yes.

Q. And that was developed through your investigators, correct?

A. Yes. My investigator located one person who seemed to verify that to some degree.

. . . .

Q. But you have told the Judge that you knew the names Sheila Renae Gordon, Debra Woods and Lloyd Turner?

A. Yes.

Q. And these were names that were supplied to you from Kendrick [sic] Jones?

A. Yes.

Q. So these were not names that you learned subsequent to his conviction?

A. No.

. . . .

Q. Do you recall approximately how long before the trial you requested the subpoena?

A. Yes. Maybe one to two days.

Q. How long of a trial was this case?

A. I think it was three days.

Q. Did you have your investigators continually trying to locate these people?

A. Yes.

Q. Did you file a written Motion for Continuance requesting a continuance so that you might secure the testimony of Ms. Woods or the other two witnesses?

A. No.

Q. Why did you not do that?

A. When the trial started, we were still under the impression that we would be able to locate these witnesses and that they weren't avoiding us, and so we

didn't file a motion prior to trial, and at the close of State's evidence, we made a strategic decision to not continue or ask for a Motion for Continuance because we felt that we stood a good chance that the State didn't put on enough evidence to find the Defendant guilty.

Q. So what was—your trial strategy was you felt the State's case was factually insufficient?

A. Yes.

As previously outlined, the record before us also contains the motion-for-new-trial testimony of Gordon and of an alibi witness she mentioned, Franklin. Both of these witnesses testified that they were willing to testify at Jones's trial and that Jones was at Gordon's apartment on the evening of the robbery. Further, Jones's trial counsel testified that his investigator had located Woods and that her testimony would have verified Jones's alibi defense. Jones testified that he saw Woods the day before the trial. Thus, the record before us establishes that these three witnesses were available. The record likewise establishes that their testimony would have benefited Jones.

The benefit of Gordon's, Franklin's, or Woods's alibi testimony is clear. At trial, the jury heard Brooks positively identify Jones as one of the robbers. Although Jones's counsel impeached Brooks's identification of Jones as the robber with the gun, Brooks's identification of Jones as one of the robbers was not challenged. Jones's only possible defense was one of alibi. Both Woods and Gordon would have provided Jones with an alibi and testified, as they did at the motion for new trial hearing, that Jones was at Gordon's house during the night of the robbery.

The State argues that trial counsel's decision "to not use the alibi" defense was sound trial strategy because Gordon's testimony actually would have "hurt" Jones by placing him at Gordon's home playing dominoes with Billy Don Smith on the night of the robbery. Gordon testified, however, that although Billy Don Smith left her home later in the evening, Jones never left her residence on the night of Brooks's robbery. Moreover, the record reflects that neither trial counsel nor his investigator spoke to Gordon prior to trial. Therefore, trial counsel could not, as the State contends, have made a strategy decision that the content of Gordon's testimony would have "hurt" Jones. *See Lane v. State*, 942 S.W.2d 208, 211 (Tex.App.-Fort Worth 1997), *reversed on other grounds*, 971 S.W.2d 451(Tex.Crim.App.1998) (holding that performance of counsel must be evaluated in light of what was known to counsel at time of trial and not in hindsight).

The State also argues that counsel's decision not to use the alibi defense was a sound strategy decision because Gordon's testimony would have harmed Jones by raising the issue of identity and would have opened the door to admission at the guilt-innocence phase of an extraneous offense ultimately admitted at punishment. *See* Tex.R. Evid. 404(b); *Mitchell v. State*, 503 S.W.2d 562, 564 (Tex.Crim.App.1974) (holding that defensive theory of alibi raises issue of identity). The extraneous offense referred to is the robbery of another pizza delivery man in Fort Worth that occurred approximately three months after Brooks had been robbed.[4]

Raising the issue of identity does not automatically render evidence of extraneous offenses admissible. *Lane v. State*, 933 S.W.2d 504, 518 (Tex.Crim.App.1996).

4. Jones was out on bond at that time.

To be admissible to show identity, an extraneous offense must be so similar to the offense charged that the offenses are marked as the accused's handiwork. *See id; see also Bishop v. State,* 869 S.W.2d 342, 346 (Tex.Crim.App.1993). The evidence should indicate such an unusual and distinctive method or characteristics as to constitute a signature offense. *Collazo v. State,* 623 S.W.2d 647, 648 (Tex.Crim.App. 1981); *Lazcano v. State,* 836 S.W.2d 654, 659 (Tex.App.-El Paso 1992, pet. ref'd).

After a careful review of the record, it appears to be a close call as to whether evidence of the extraneous offense would have been admissible in the guilt/innocence phase even if Jones's identity had been placed in issue by alibi witnesses. *Compare Beets v. State,* 767 S.W.2d 711, 740 (Tex.Crim.App.1987) (op. on reh'g) (noting the defendant's "signature" use of the same weapon, the same motive, the same time of day and the same means of disposing of bodies in two different murders), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579 (1989) *with Lazcano,* 836 S.W.2d at 659 (holding general similarities between sexual assault offenses were "wholly innocuous as such features would tend to be common to many cases"); *but see Collins v. State,* 548 S.W.2d 368, 376 (Tex.Crim.App.1976) (holding that four small business robberies in Waco that occurred relatively close in time and involved (1) appellant acting alone, (2) brandishing a pistol, (3) and making victim lie facedown on the floor were admissible to show identity), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977).

Assuming, however, that the State is correct that admission of alibi testimony would trigger admission of the extraneous offense, the record before us establishes that the alibi testimony nevertheless would have benefited Jones. Alibi testimony would have given the jury an opportunity to choose between the State's version of events on the night of October 31, 1999, possibly buttressed by an extraneous subsequent robbery, and Jones's version of events. Such choice is the essence of the "reliable adversarial testing process" called for in *Strickland. See* 466 U.S. at 685, 104 S.Ct. at 2065 (noting that a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution). We hold that the record before us establishes that Gordon, Franklin, and Woods were available and that their testimony would have benefited Jones.

Thus, the record before us, developed by Jones at the hearing on his motion for new trial, establishes that trial counsel was aware of Jones's alibi defense many months before trial; that Jones provided the names of three alibi witnesses to his trial counsel; that counsel's investigator located only one of the witnesses; that the one witness located, Woods, corroborated that Jones was with her on the night of the robbery; that despite trial counsel's knowledge that the case was set for trial[5], he failed to have subpoenas issued for the alibi witnesses until only two days before trial, and then failed to get them served; that at the beginning of trial, counsel still thought the alibi witnesses would be served and intended to put on an alibi defense; that after the State rested, counsel made the strategic decision to put on no defense because he believed the State's case was factually insufficient; and that Gordon, Franklin, and Woods were avail-

**5.** Trial counsel testified that, "Well, we had been on the trial docket, and I think that at least a month prior to the docket appearance we had a good idea that we might be reached."

able and their testimony would have been helpful to Jones's defense.

We now turn to the question of whether this record affirmatively demonstrates the ineffectiveness of Jones's counsel. That is, whether trial counsel's failure to secure service of subpoenas on the alibi witnesses and to move for a continuance to secure their presence may, when viewed from counsel's perspective at the time he took these actions, without the distorting effects of hindsight, fall outside the wide range of professionally competent assistance. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Jones's trial counsel's articulated strategy for failing to seek a continuance to secure the presence of alibi witnesses was his belief that the State "didn't put on enough evidence to find the defendant guilty." Applying great deference to counsel's trial judgment, we hold that this decision was not reasonable based on the facts and circumstances existing at the time it was made. Brooks, the victim, identified Jones as the robber. The State's case rested solely on this identification.[6] Jones's only viable defense was to present his alibi. In choosing to rest after the State rather than moving for a continuance to get the subpoenas served on potential alibi witnesses, counsel effectively deprived his client of any defense. At that point in the trial, counsel's duty to "pres-

ent sufficient available evidence in support of [his client's] defensive theory" had not run its course. *Duffy,* 607 S.W.2d at 518; *See also Butler,* 716 S.W.2d at 48; *Shelton,* 841 S.W.2d at 527.

Moreover, the record reflects that counsel had subpoenas issued for the alibi witnesses and intended to call these witnesses at trial. He was "under the impression that we would be able to locate these witnesses" and serve them with subpoenas prior to presentation of the defense's case. The record thus affirmatively demonstrates that the failure to get the subpoenas served on the alibi witnesses was not part of a calculated trial strategy or tactical decision, but that service simply had not been effectuated by the time the State rested. *Strickland,* 466 U.S. at 690–91, 104 S.Ct at 2066.[7]

The State seems to assert that because Jones's trial counsel obtained Jones's consent to his decision to put on no defense Jones's consent somehow validated this decision or made it reasonable. When Jones audibly reacted to his trial counsel's unilateral decision to rest without calling any witnesses or offering any evidence, the trial court provided trial counsel the opportunity to confer with Jones, and Jones gave his consent. Because the witnesses had not been served with subpoenas, Jones's consent to not calling them was

---

6. The State's brief summed up the case:
   The case here was not overwhelming. The victim was accosted on a dark street at night and robbed of his wallet containing credit cards. There was no one present other than the victim and the two robbers. Nothing to lift fingerprints off of and no weapon or property recovered.

7. The *Strickland* Court explained:
   [S]trategic choices made after through investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
*Strickland,* 466 U.S. at 690–91, 104 S.Ct at 2066.

meaningless. It was impossible to call them, absent a motion for continuance. Thus, the record before us does not reflect that Jones's trial counsel reached a strategic decision based on Jones's desires and consent.

In light of the totality of Jones's representation and all of the circumstances and prevailing professional norms at the time of trial, even giving great deference to the judgment of trial counsel, we cannot conclude that Jones's trial counsel possessed any plausible basis or reasonable strategy for failing to move for a continuance to secure the presence of the alibi witnesses. We hold that, based on the record before us, Jones rebutted the strong presumption that counsel's performance was the result of sound or reasonable trial strategy and demonstrated that his counsel's performance was deficient.

Accordingly, and in light of the totality of counsel's representation in this particular case, we hold that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 669, 104 S.Ct. at 2055. Jones has satisfied the first prong of the *Strickland* test.

### B. *Strickland's* Second Prong: Prejudice.

We now consider the second prong of *Strickland*, under which we must determine whether counsel's decision to forgo moving for a recess or continuance to put on an alibi defense ultimately deprived Jones of a fair trial. *See* 466 U.S. at 687, 104 S.Ct. at 2064. The test is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. In applying this test, we are guided by our decision in *Shelton*, 841 S.W.2d at 526.

In *Shelton*, the defendant was charged with sexual assault of a child. *Id.* His initial conviction was reversed, and he was tried a second time. At re-trial, the defendant's attorney failed to call as an alibi witness the defendant's great-niece, who had testified at the first trial, and whose testimony would have directly contradicted the complainant's testimony. *Id.* It was established that the niece would have been available to testify in the second trial, but the defense attorney never contacted her. *Id.* at 527. This court held counsel was ineffective and reversed the conviction:

> When counsel neglected to present available testimony in support of Shelton's alibi defense, he failed in his professional duty to his client. *See Ex Parte Ybarra*, 629 S.W.2d 943, 948 (Tex.Crim.App. 1982). *The attorney's failure to advance the one defense apparently available to Shelton clearly made his assistance ineffective if not incompetent. See Ex parte Duffy*, 607 S.W.2d 507, 517 (Tex. Crim.App.1980).

*Id.* (emphasis added).

Like Shelton's counsel, Jones's trial counsel squelched the one defense available to his client when he abruptly rested the defense without giving himself a continued opportunity to call the alibi witnesses for which subpoenas had issued. It is well settled that a single egregious error of omission or commission by counsel may constitute ineffective assistance. *See Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim.App.1991) (ruling failure to challenge a void prior conviction used to enhance punishment range rendered counsel ineffective); *but see Melancon v. State*, 66 S.W.3d 375, 379 (Tex.App.-Houston [14th Dist.] 2002, no pet. h.) (holding record insufficient to establish that counsel's failure to subpoena alibi witness and secure her testimony at trial constituted ineffective assistance of counsel where witness

did not testify at motion for new trial hearing).

Accordingly, we hold that counsel's single omission, the failure to move for a continuance to secure the testimony of alibi witnesses, deprived Jones of a fair trial; that is, a trial whose result is reliable. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Butler,* 716 S.W.2d at 56 (holding that when no physical evidence linked defendant to crime and conviction rested solely on testimony of the complainant, the failure to investigate and call two witnesses who would say defendant was not the robber and one alibi witness was sufficient to undermine confidence in the outcome of the trial); *Shelton,* 841 S.W.2d at 527 (holding counsel's failure to call alibi witness, thereby failing to advance one available defense, satisfied second prong of *Strickland* ). There is a "reasonable probability," that is, a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for counsel's unprofessional error. *Mallett,* at 62. Based on the record from Jones's motion for new trial hearing, Jones satisfied the *Strickland* test, and the trial court abused its discretion by denying his motion for new trial. We sustain Jones's second and third issues.

## VI. THE EXTRANEOUS USE OF BROOKS'S CREDIT CARD

In his first issue, Jones argues that the trial court erred in admitting, during the guilt/innocence phase of the trial, evidence regarding the extraneous offense of his use of Brooks's credit card at Just For Feet. Prior to trial, the court granted Jones's motion in limine to exclude all evidence relating to his illegal use of Brooks's credit card. The State violated this limine order during its opening statement by referring to Jones's use of the stolen credit card at Just For Feet. Jones objected, and moved for a mistrial.

The trial court conducted a hearing outside the presence of the jury to revisit the limine issue concerning this evidence. At the hearing, the State contended that evidence of Jones's credit card abuse was admissible to identify Jones as one of Brooks's robbers. Jones responded by arguing that his use of Brooks's credit card could not be offered as proof that he was responsible for stealing the card absent a showing that the credit card used by Jones was in fact a credit card stolen in the robbery. When asked by the court if Brooks would testify at trial that the credit card used by Jones at Just For Feet was a credit card stolen from him during the robbery as opposed to one that had been "lost," the State replied, "Yeah, he will say that." Accordingly, the court reversed its initial limine ruling and denied Jones's motion for limine concerning the illegal use of Brooks's credit card. The court admonished counsel, however, that if the State did not establish that the credit card used by Jones was one stolen in the robbery, "that Motion for Mistrial is just about three words away."

At trial, Lakesha Houston testified that she observed Jones pay for approximately $500 worth of goods at Just For Feet with Brooks's credit card. Jones did not object to this testimony. Nor did Jones object when Brooks failed to testify that the credit card used by Jones was a credit card stolen in the robbery. The State presented no evidence at trial that connected Jones's use of Brooks's credit card with any card that purportedly had been stolen on the night of the robbery. Nevertheless, Jones did not object or move for a mistrial.

The denial of a motion in limine is not sufficient to preserve error for review; there must be a proper objection to the

proffered evidence. Tex.R.App. P. 33.1(a); *McDuff v. State,* 939 S.W.2d 607, 618 (Tex. Crim.App.), *cert. denied,* 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997); *Graham v. State,* 3 S.W.3d 272, 276 (Tex.App.-Fort Worth 1999, pet. ref'd). Because Jones did not object or move for a mistrial when the extraneous offense evidence was offered, this issue is not preserved for our review. *McDuff,* 939 S.W.2d at 618; *Graham,* 3 S.W.3d at 276. We overrule Jones's first issue.

### VII. Conclusion

Having sustained Jones's second and third issues, we reverse the trial court's judgment and remand for a new trial.